**Levi HUDSON**

v.

**Edwin GOODLANDER et al.**

**Civ. No. Y–79–2403.**

United States District Court,
D. Maryland.

July 29, 1980.

Levi Hudson pro se.

Donald R. Stutman, Asst. Atty. Gen., Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

Plaintiff, Levi Hudson an inmate at the Maryland House of Correction filed this action under § 1983 for damages and injunctive relief against Edwin Goodlander, the Commissioner of Corrections, and Paul Davis, the Warden at the institution. In his complaint, Hudson alleged that his constitutional right to privacy was violated when female correctional officers viewed him using the toilet, undressing, and showering. The Court denied the defendants' motion for summary judgment, as the emerging case law in this area establishes a right to be free from such invasions of privacy. *Forts v. Ward*, 471 F.Supp. 1095 (S.D.N.Y. 1978), aff'd in part and rev'd in part, 621 F.2d 1210 (2d Cir. 1980); *In re Long*, 127 Cal.Rptr. 732 (Cal.App.1976); cf. *Gunther v. Iowa State Men's Reformatory*, 462 F.Supp. 952, 956 (N.D.Iowa 1979). An evidentiary hearing was therefore held on June 23, 1980 to determine the frequency and regularity of the assignment of female correctional officers to posts where they are exposed to inmate nudity. This issue is critical because neither an inadvertent encounter nor a regularly scheduled visit by a female employee at an announced time would rise to the level of constitutional deprivation. *Avery v. Perrin*, 473 F.Supp. 90 (D.N.H.1979).

The confrontation of existing rights highlighted in this case is not unexpected. The defendants are caught in a situation where, by attempting to insure equal employment opportunities to females, they have infringed upon the privacy rights of the inmates.

The Court suspects this is one case the State is prepared to lose.

The testimony of inmate witnesses as well as that of the defendants established that female correctional officers were regularly assigned to posts where they would encounter male inmates washing, undressing or performing other private functions. This practice resulted from the revision of Department of Correction Regulation No. 115–5 in September, 1979. The old regulation limited the general policy of "unrestricted assignment" of correctional officers by providing that "with regard to females working in male institutions, and males working in female institutions, post assignments will be restricted in only those areas where inmate nudity occurs as part of the normal institution routine." In addition, "[s]trip or skin searches of inmates of one sex" by guards of the other sex were prohibited. These restrictions, however, did not apply "[d]uring periods of emergency or disorder [when] all officers . . . [were] subject to any assignment where needed." In September, 1979, however, this regulation was revised by the deletion of the sentence restricting the assignment of officers of the opposite sex to posts where inmate nudity occurs regularly. Commissioner Goodlander explained that this change was made in response to the complaints of male guards who felt that they received a disproportionate share of the onerous assignments and of female guards whose opportunities for advancement were limited by their inability to become familiar with all facets of the institution.

Despite the apparently unambiguous mandate of the revised regulation, the testimony of Warden Davis established that shift commanders retained some discretion concerning the assignment of female correctional officers to areas where inmate nudity occurred. A memorandum dated September 28, 1979 from Richard E. Vernon, the Acting Assistant Warden for Security, approved by Warden Davis, stated the general rule that "all female Correctional Officers will be assigned to all officer posts." This general rule was modified, however, by the instruction to Duty Lieutenants "to assign all female officers to posts on a rotating basis to familiarize them with posts they are not familiar with." The memorandum also provided that the regulation "should not be interpreted to mean that female Correctional Officers must be assigned to inmate housing areas on a regular basis." Finally, the memorandum reaffirmed the discretion of Duty Lieutenants in determining "the suitability of individual officers to various post assignments."

In accordance with this directive, women Correctional Officers were assigned to posts where they were exposed to inmate nudity on the tiers, in the recreation room, and in the hospital.[1] The frequency of assignment of women to these posts, however, was not commensurate with their proportion of the labor force. Whereas 21 of the 337 Correctional Officers at MCH are women, the average number of shifts per week on which there was a woman officer assigned to one of the posts in question was 1.6. Of course, even such infrequent assignment of female officers to these posts can mean that there are literally hundreds of opportunities for incidents such as those complained of by plaintiff.

*Were Plaintiff's Rights Violated by the Assignment of Female Correctional Officers to Posts Where They Encountered Inmate Nudity*

■ As noted by the Supreme Court in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1978), "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." To the extent necessary to achieve the legitimate goals of incarceration and to maintain security, enjoyment of these rights may be restricted. *Id.* at 546,

---

1. However, the privacy of inmates in the dormitories was protected by restricting female officers to the security control area. Only male officers circulated through the areas where the showers and toilets are located. A similar restriction applied at the central storeroom showers where only male officers manned the observation deck whereas guards of both sexes manned the grill post from which the showering inmates cannot be seen.

99 S.Ct. at 1877. Where constitutional rights are implicated, however, the Court has a duty to ascertain that such restrictions represent reasonable means of achieving these goals.

The defendants have posited three governmental interests in support of the challenged practice. First, the state has an interest in obeying state and federal laws banning employment discrimination on the basis of sex.[2] Second, the institution has an interest in avoiding discontent among the Correctional Officers who view sex-based assignments as unfair. The third asserted state interest is the official policy in favor of normalization of the prison environment.

■ The last justification articulated is most easily disposed of. While the Court defers to the Commissioner's judgment that normalization of the prison environment is a desirable policy, it finds that policy cannot be furthered rationally by subjecting male prisoners who are using the showers or toilet facilities to the scrutiny of female officers. Such a practice aggravates, rather than mitigates, the disparity between the prison environment and society at large. This is not to suggest, however, that employment of women in other positions at the prison is other than a beneficial practice.

· ■ What concerns the Court is Goodlander's contention that amelioration of employee discontent and promotion of women to supervisory positions are predicated upon having women serve in all capacities within the institution. Courts faced with the collision of inmate privacy interests and equal employment opportunity policies in the prison context have mandated different accommodations. In *Forts v. Ward, supra,* for example, numerous changes in prison routine were mandated so that male officers could serve in all capacities within a women's prison. These changes included the erection of shower screens, the announcement of morning roll call five minutes in advance so that inmates could make themselves presentable, and the provision of modest sleepwear. The court in *Gunther,*

*supra,* 462 F.Supp. at 955, was similarly solicitous of guards' interest in equal employment opportunities. Despite the fact that there were duties which women officers could not perform without violating the inmates' privacy rights, the court invalidated a state rule barring women from promotion to positions above the entry-level position. The approach of courts in these cases, however, contrasts with that taken in *In re Long, supra,* and *Iowa Department of Social Services v. Iowa Merit Employment Department,* 261 N.W.2d 161 (Iowa 1977). In the latter two cases, the courts approved the exclusion of women from positions where inmate nudity would be encountered on a regular basis. In none of these cases, however, did the courts find the employees' interest in equal opportunities sufficiently compelling so as to override the inmates' privacy rights. Therefore, the Court must find that the plaintiff's rights were violated by the assignment of female guards to posts where they could view him while he was completely or entirely unclothed.

*Injunctive Relief*

The necessity for granting injunctive relief has been diminished by voluntary measures recently taken by the defendants to provide greater protection for prisoners' privacy rights. With some modification, these measures should adequately protect inmate privacy. First, Goodlander averred that there will be "a sufficient number of tiers, to number no more than three tiers, on which only male correctional officers may be assigned and to which inmates may be assigned by choice." This provision would appear to protect the privacy interests of inmates residing on the tiers. However, the Court finds that if enough inmates desire protection of their privacy interests, the numerical limitation on the number of tiers from which female officers are excluded will have to be lifted. The second measure taken was the "promulgation of guidelines excluding female officer assignment to the recreation . . . room." This measure is clearly required, as all of the

---

2. *See* 42 U.S.C. § 2000e *et seq.* and Md.Const., Art. 46.

witnesses testified that there is no feasible method of screening the inmates showering in this room from the view of the officer assigned to it. Finally, Goodlander averred that there would be "promulgation of guidelines limiting female officers assignment in the hospital to the grills, as opposed to the ward." This measure will adequately protect the privacy of inmates housed in that area.

Two additional issues concerning the adequacy of the remedial measures undertaken by the defendants require discussion. First, a June 17, 1980 memorandum from Major Vernon to Warden Davis states that the institutional policy is that "[d]uring training periods female Correctional Officers may visit all posts to become familiar with that particular post duty requirements so that all officers are familiar with posts in case they may have to man that post during an emergency situation." In addition, Commissioner Goodlander has testified that such familiarity is a prerequisite to promotion to a supervisory position. The Court finds such visits unobjectionable, provided that the anticipated presence of women in areas where inmates might be undressed or attending to personal bodily functions is announced sufficiently in advance. The testimony at trial, however, indicated that female officers were not only visiting such areas, but were actually assigned to posts in them. This practice will be enjoined, and only announced visits will be permitted. The Court understands from Commissioner Goodlander's testimony that such prior announcement of rounds may seriously implicate security. The issue in this case, however, is the extent to which the activities of female Correctional Officers must be circumscribed in light of inmate privacy rights; the Court need not decide whether and to what extent Title VII or the Maryland Equal Rights Amendment mandates that the institutional routine be altered to accommodate females seeking employment or promotion at the institution. *Cf. Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (upholding regulation precluding women from serving in contact positions in maximum security institutions for male inmates).

The second issue requiring resolution is the extent to which these restrictions on the deployment of female Correctional Officers can be properly dispensed with during times of emergency. Two types of emergencies were suggested by Commissioner Goodlander. First, an emergency may arise when unrest breaks out among the inmates. At such times, the officers in the affected areas require the assistance of officers stationed elsewhere. In such cases, it appears to be eminently reasonable that the nearest officers should be able to render assistance, regardless of their sex. Any temporary violation of inmate privacy that might occur would be justified by the overriding necessity to protect the safety of both inmates and officers. The second type of emergency alluded to by Goodlander arises when the institution is understaffed. It is obvious that the restrictions imposed by the Court will limit the Warden's flexibility in dealing with manpower shortages. Presumably, this problem will become more serious if the proportion of women on the staff increases. Again, it must be noted that this Court does not have before it the question of the extent to which women's interests in equal employment opportunities must be protected in this setting. Rather, the Court is only deciding the extent to which those employment interests are subject to more compelling privacy concerns of the inmates. Given that manpower shortage can be anticipated and planned for, unlike emergencies such as riots, the Court is not willing to exempt such situations from the restrictions on the assignment of women articulated earlier.

*Is Plaintiff Entitled to Damages*

As prison officials, the defendants are entitled to qualified immunity on the damage claim. However, "the immunity defense would be unavailing . . . if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if

they knew or should have known that their conduct violated the constitutional norm." *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978). An examination of the case law in this area reveals a wide disparity in the judicially mandated accommodation of equal employment opportunity policies and privacy interests of inmates. The defendants clearly attempted to conform their conduct to what they perceived to be the constitutional norm. Given the importance of each of the competing interests, and the relative dearth of clear judicial guidance in this area, the Court finds that the defendants acted reasonably, albeit incorrectly, in setting the challenged policy. Therefore, the claim for damages will be denied.

Accordingly, it is this 29th day of July, 1980, by the United States District Court for the District of Maryland, ORDERED:

1. That judgment be entered for the plaintiff on the claim for injunctive relief;

2. That judgment be entered for the defendant on the claim for damages; and

3. That copies of this Memorandum and Order be sent to plaintiff and counsel for the defendants.