RUSHING v WAYNE COUNTY

Docket No. 61678. Submitted October 19, 1983, at Detroit.—Decided July 10, 1984.

Linda H. Rushing was detained in the Wayne County Jail from June 8 to June 12, 1976, on an obstruction of justice charge. Because of information indicating that Rushing might have suicidal tendencies, Rushing was required to remove all her clothes except for her panties and remained in that state of undress during the period of her confinement. You Kim, a psychologist employed by Wayne County, ordered the removal of Rushing's clothes on the basis of a circuit court order that the clothing of all inmates exhibiting suicidal tendencies be removed from them until it was determined that it was safe to return the clothes to the inmate. Kim advised Milas Lebedevitch, a psychiatrist employed by Wayne County, of the fact that Rushing had indicated to him that she was an epileptic and

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error § 886.

[2] 60 Am Jur 2d, Penal and Correctional Institutions §§ 17, 19.

[3-5, 7, 9] 57 Am Jur 2d, Municipal, School, and State Tort Liability § 90.

[3-5, 7] 60 Am Jur 2d, Penal and Correctional Institutions § 17.

[4, 5, 7-9] 57 Am Jur 2d, Municipal, School, and State Tort Liability § 88.

[6] 38 Am Jur 2d, Fright, Shock, and Mental Disturbance §§ 6, 13 et seq.

Right to recover for emotional disturbance or its physical consequences, in the absence of impact or other actionable wrong. 64 ALR2d 100.

[7] 57 Am Jur 2d, Master and Servant § 417 et seq.

[10] 60 Am Jur 2d, Penal and Correctional Institutions § 41.3

[11-13] 60 Am Jur 2d, Penal and Correctional Institutions § 52.

[14] 75 Am Jur 2d, Trial § 1031.

Tests or experiments in jury room. 95 ALR2d 351.

[15] 81 Am Jur 2d, Witnesses §§ 603, 611.

[16] 81 Am Jur 2d, Witnesses §§ 474, 476.

[17] 5 Am Jur 2d, Appeal and Error § 713 et seq.

[18] 75 Am Jur 2d, Trial § 1003.

Prejudicial effect, in criminal case, of communication between court officials or attendants and jurors. 41 ALR2d 227.

that she needed her customary dosage of medication for that condition. Rushing brought an action for damages in Wayne Circuit Court, naming Wayne County, Kim and Lebedevitch as defendants. Plaintiff claimed that the individual defendants, by ordering her to be confined in an unclothed state, had intentionally inflicted emotional distress on her. Plaintiff claimed that defendant county, by reason of the actions of the individual defendants and by reason of the permitting of certain jail employees to view her in that state, had also intentionally inflicted emotional harm. Plaintiff alleged a civil rights claim under 42 USC 1983 as to all defendants on the basis that the act of requiring her to remain unclothed was in violation of her constitutional rights, including her right of privacy and that she had been denied necessary medication for her epileptic condition. Plaintiff further made a claim against defendant county under the building defect exception to the governmental immunity statute. Following the presentation of evidence, defendants moved for a directed verdict on the intentional infliction of emotional distress and violation of civil rights claims. The trial court, James A. Hathaway, J., granted directed verdicts in favor of the county on those claims. The jury thereafter returned a verdict of no cause of action as to the remaining claims against the county and the individual defendants. Plaintiff appealed. *Held:*

1. A governmental unit may be liable under the doctrine of *respondeat superior* for an employees intentional misconduct.

2. A claim for intentional infliction of emotional distress requires a showing of conduct of an outrageous character. Plaintiff's proofs with respect to her intentional infliction of emotional distress claim against the county, insofar as that claim involved unnamed deputy sheriffs, failed to establish conduct of an outrageous character.

3. While there was sufficient evidence to require jury resolution of plaintiff's claim of intentional infliction of emotional distress by the county based upon the actions of the individual defendants, the failure to submit that issue to the jury does not mandate reversal, since liability on the part of the county would require a finding of liability on the emotional distress claims against the individual defendants and the jury found no such liability on the part of the individual defendants.

4. A 42 USC 1983 civil rights claim against a governmental unit requires proof of an affirmative link between the alleged misconduct and some officially approved plan, policy or custom approved by the governmental unit and may not be based merely upon the doctrine of *respondeat superior.* Further, the

misconduct must amount to deliberate indifference, gross negligence or recklessness.

5. Insofar as plaintiff's civil rights claim agianst the county is based on the alleged violation of her right to privacy, plaintiff failed to show either deliberate indifference or a plan or policy approved by the county which resulted in the alleged misconduct. Therefore, any claim of liability based on the violation of plaintiff's right to privacy would have to be premised upon the application of the doctrine of *respondeat superior,* a theory of recovery which does not create liability in the county for a 42 USC 1983 claim.

6. A 42 USC 1983 civil rights claim exists where a jail detainee is, through deliberate indifference, denied necessary medical attention. The record fails to establish either deliberate indifference or a plan, policy or custom approved by the county to deny such medical attention. Since any liability of the county on the denial of medical attention claim under 42 USC 1983 would necessarily have to have been premised on the application of the doctrine of *respondeat superior,* a directed verdict in favor of the county on that claim was properly granted.

7. The trial court properly exercised its discretion in refusing to permit certain exhibits to be taken into the jury room.

8. The trial court properly refused defense counsel's request to read from the deposition of defendant Kim after Kim had been excused as a witness.

9. Since plaintiff raised the issue of criminal charges which had been brought against several of her witnesses, the trial court properly permitted the defense to make further inquiry into those matters.

10. Reversal is not mandated by reason of the fact that the bailiff, in response to a question by the jury during deliberations, told the jury that they should write a note to the judge. While there is a strict rule prohibiting communication with a deliberating jury outside of the courtroom and the presence of counsel, the statement by the bailiff to the jury could not have swayed the jury and was the proper thing to do under the circumstances.

Affirmed.

1. APPEAL — DIRECTED VERDICTS.

An appellate court in reviewing a trial court's grant of a directed verdict must review all the evidence presented to determine if a fact question exists; in doing so, the reviewing court must view the evidence in a light most favorable to the nonmoving

party, granting him every reasonable inference and resolving any conflict in the evidence in his favor; if the evidence, viewed in this manner, establishes a prima facie case, *i.e.*, presents a question upon which reasonable minds could differ, the trial court's grant of a directed verdict must be reversed.

2. GOVERNMENTAL IMMUNITY — JAILS — OPERATION AND MAINTENANCE OF JAILS — GOVERNMENTAL TORT LIABILITY ACT.

The operation and maintenance of a jail is within the scope of the performance of a uniquely governmental function which is accorded immunity from tort liability under the governmental tort liability act (MCL 691.1407; MSA 3.996[107]).

3. GOVERNMENTAL IMMUNITY — INTENTIONAL TORTS.

Intentionally tortious acts committed by agents of governmental units are not activities within the exercise or discharge of a governmental function and should not be protected by the doctrine of governmental immunity.

4. GOVERNMENTAL IMMUNITY — GOVERNMENTAL AGENCIES — INTENTIONAL MISCONDUCT — *RESPONDEAT SUPERIOR.*

A governmental agency may be liable under the doctrine of *respondeat superior* for an agent's intentional misconduct.

5. CONSTITUTIONAL LAW — SHERIFFS AND CONSTABLES — COUNTIES — VICARIOUS LIABILITY — DEPUTY SHERIFFS — *RESPONDEAT SUPERIOR.*

The Michigan Constitution exempts counties from any vicarious liability arising from acts of the county sheriffs but does not exempt the counties from liability under the doctrine of *respondeat superior* for a deputy sheriff's alleged wrongs (Const 1963, art 7, § 6).

6. TORTS — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

One who, by extreme and outrageous conduct, intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm; liability is confined to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community; liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

7. MASTER AND SERVANT — *RESPONDEAT SUPERIOR* — TORTS — VICARIOUS LIABILITY.

An employer is liable under the doctrine of *respondeat superior*

for the acts of an employee when the employee is acting within the apparent scope of his authority, even though acting contrary to instructions, and the employer is not able to instruct his employee only to act within the confines of the law, thereby insulating himself from vicarious liability if the employee acts otherwise.

8. TORTS — GOVERNMENTAL AGENCIES — *RESPONDEAT SUPERIOR* — QUESTION OF FACT.

Whether an agent of a governmental entity alleged to be liable under a *respondeat superior* theory has acted within his or her apparent authority is a question of fact.

9. CIVIL RIGHTS — MUNICIPAL CORPORATIONS.

Municipalities are persons for purposes of liability for deprivation of civil rights under 42 USC 1983; a municipality cannot, however, be found liable under § 1983 on a *respondeat superior* theory; the municipality must be sued directly and liability must be based upon an official policy or custom which causes the injury; a plaintiff must show an affirmative link between the misconduct and the adoption of any plan or policy, showing defendant's authorization or approval of such conduct.

10. CIVIL RIGHTS — RIGHT OF PRIVACY.

A pretrial detainee in a county jail has a constitutionally protected right of privacy not to be subjected by government action to involuntary exposure in a state of nakedness to members of the opposite sex unless that exposure is reasonably necessary to the detainee's legal detention; however, the county is not subject to liability in a 42 USC 1983 civil rights action based upon a violation of that right of privacy unless the acts which led to the violation of that right arose out of a policy authorized or approved by the county or from deliberate indifference by the county to the detainee's right to privacy.

11. CIVIL RIGHTS — MEDICAL CARE — PRISONS AND PRISONERS — ACTIONS.

A civil rights action under 42 USC 1983 based upon the failure of jail officials to provide necessary medical care and treatment to the plaintiff while he was a detainee in the jail exists where the plaintiff alleges acts or omissions which are sufficiently harmful to evidence a deliberate indifference on the part of jail personnel to serious medical needs.

12. PRISONS AND PRISONERS — MEDICAL CARE.

Every prisoner or detainee has a right to receive medical care under circumstances in which a reasonable person would seek

medical care; prison or jail authorities must make available a level of medical care reasonably designed to meet the inmate's routine and emergency health care needs; a prisoner or detainee is entitled to have both his physical needs and his psychological needs met.

13. Prisons and Prisoners — Medical Care.

A two-step test is applied in evaluating a prisoner's or detainee's claim that jail or prison officials failed to provide him necessary medical care and treatment; it requires deliberate indifference on the part of the officials and it requires the prisoner's or detainee's medical needs to be serious; to show deliberate indifference the plaintiff must show either denied or unreasonably delayed access to a physician for diagnosis or treatment of a discomfort-causing ailment, or failure to provide prescribed treatment; a medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.

14. Evidence — Exhibits — Jury — Courts — Trials.

The question of whether to permit the jury to take exhibits to the jury room is addressed to the discretion of the trial court; the trial court's refusal to permit the taking of exhibits to the jury room is not an abuse of discretion where the jury has been fully informed as to the nature of the exhibits and the refusal to permit the exhibits in the jury room does not result in prejudice.

15. Witnesses — Impeachment — Depositions.

A party-witness may be impeached through the use of a prior inconsistent statement made in a deposition; however, there exists no right to have the deposition of a party-witness read to the jury after the witness has been excused as a witness (GCR 1963, 302.4; MRE 613[a]).

16. Witnesses — Cross-Examination — Relevancy — Credibility.

A witness may be cross-examined on a matter relevant to any issue in a case, including credibility (MRE 611[b]).

17. Evidence — Appeal — Preserving Question.

A party who opens the door on a particular subject matter by raising the matter initially at trial may not on appeal complain because the opposing party more fully developed the subject matter.

18. Trial — Communication With Jury.

Communication with a deliberating jury outside of the courtroom

and the presence of counsel is strictly prohibited; however, reversal is not mandated where a bailiff, in response to a question by the jury, informs the jury that they should write a note to the judge, since it is clear that under such circumstances the statement of the bailiff could not have swayed the jury and, indeed, was the proper thing to do under the circumstances.

*Becker & Van Cleef* (by *Frank G. Becker* and *Arthur Greenstone),* for plaintiff.

*Edward L. Douglas,* Acting Corporation Counsel, and *John J. McCann* and *Richard A. Kudla,* Assistants Corporation Counsel, for defendants.

Before: V. J. BRENNAN, P.J., and CYNAR and C. W. SIMON, JR.,* JJ.

PER CURIAM. Plaintiff appeals as of right from a jury verdict in favor of all defendants and a partial directed verdict in favor of defendant county in which plaintiff's intentional tort and 42 USC 1983 claims were dismissed.

In her amended complaint, plaintiff alleged that, while she was detained in the Wayne County Jail on the charge of obstruction of justice, defendants Kim and Lebedevitch, while acting in their positions of authority as employees of Wayne County, forced her to remain disrobed in her cell for several days, "unclothed except for underclothing". Furthermore, plaintiff alleged that defendants denied plaintiff her customary dosage of medication for her epileptic condition while she was confined in jail. Plaintiff brought this action, claiming that, by their conduct, defendants Kim, a psychologist, and Lebedevitch, a psychiatrist, intentionally inflicted emotional distress upon her.

In addition, plaintiff alleged that, while she was

---

* Circuit judge, sitting on the Court of Appeals by assignment.

unclothed and in her cell, she was viewed by several male employees of the Wayne County Sheriff's Department and that defendant Wayne County had also intentionally inflicted emotional harm. In count II of her complaint, plaintiff alleged a violation of 42 USC 1983, and claimed that defendants' conduct violated her constitutional rights, including the protected right of privacy. In a "clarified" second amended complaint, plaintiff alleged a violation by defendant Wayne County of the "building defect" exception to the governmental immunity statute. MCL 691.1406; MSA 3.996(106).

At the time of plaintiff's detainment, the Wayne County Jail was subject to a circuit court order which required the jail staff to remove clothing from an inmate who exhibited suicidal tendencies. The order further provided that when clothing was so removed "the advice of persons with psychiatric training must be promptly sought respecting the return of some or all of such articles and implements".

Plaintiff was incarcerated in the Wayne County Jail from June 8 to June 12, 1976. At trial, John Nicholl, a social investigator whose duties included processing and counseling inmates at the jail, testified that he was employed by defendant county. On June 9, 1976, he received a telephone call from a person purporting to be plaintiff's sister who informed him that plaintiff threatened suicide. Nicholl relayed this information to personnel on the floor on which plaintiff was housed, the doctor's office, and defendants Lebedevitch and Kim.

Defendant Kim testified that his main duties involved the diagnostic evaluation of the mentally ill and suicidal individuals. After Nicholl informed Kim about the phone call, Kim ordered plaintiff to

be stripped of all clothing except her panties pursuant to the mandates of the cricuit court order. He then went to the wing where plaintiff was housed to examine her to determine if plaintiff was suicidal. Kim spoke with plaintiff through the bars of her cell. At the time of that conversation, plaintiff was nude except for her panties. Although he did not think plaintiff was psychotic, Kim felt that she was suicidal because of threats she made. The plaintiff did tell Kim that she was an epileptic who needed Dilantin, and Kim gave this information to defendant Lebedevitch.

Kim further testified that, "for safety precautions", plaintiff remained unclothed except for her panties during her entire confinement for the observation of her behavior. Other than his initial visit, Kim did not visit plaintiff at any other time. Furthermore, Kim did not know if plaintiff ever received her Dilantin. Kim also testified that there was no further reason for either defendant Lebedevitch or him to see plaintiff because the reports from other personnel indicated that she had been adjusting. He had no knowledge about a janitor or a group of students who observed plaintiff.

Plaintiff testified that she was ordered to disrobe by a male deputy. Both the male deputy and a female deputy were present when plaintiff removed her dress and bra. The female deputy explained to plaintiff that she had to disrobe because she was supposed to be a suicide case. According to plaintiff, she was taken from her cell to see a doctor. Plaintiff then spoke with defendant Kim, who did not ask her if she was suicidal. Plaintiff testified that she was not suicidal. Kim did tell plaintiff that she could have her clothing back when she returned to her cell. However, her clothing was not returned.

Plaintiff stated that several times during her

confinement a male custodian stood outside her cell and stared. She also testified that, on one occasion, the custodian watched and whistled at her as she readied herself to use the bathroom. Plaintiff attempted to shield herself from his view by covering her bare chest with her arms. On another occasion, in defendant Kim's presence, a group of 10 or 12 men observed her. Plaintiff testified that Kim just looked at her and laughed.

Plaintiff stated that she was given Dilantin on her first evening in jail and, on the following day, she was given Dilantin and Tylenol. However, during her third day of confinement, plaintiff was not given her medication. Plaintiff also testified that after her interview with defendant Kim she received no other visits from any social worker or psychologist.

Beverly Wagner, who was detained in a cell just two doors from plaintiff's cell, testified that, after plaintiff was stripped, women inmates, deputies, medical personnel and a custodian walked by plaintiff's cell. Wagner testified that the custodian was present every morning and that she had chastised him for staring at the plaintiff as she stood with her back to the custodian while trying to shield herself from his view. Wagner also stated that, on the third day of plaintiff's confinement, the custodian stood by plaintiff's cell and whistled at her, and Wagner corroborated plaintiff's testimony about the group of men who observed plaintiff.

Several of plaintiff's relatives testified about the metamorphosis in both plaintiff's appearance and personality which had coincided with her jail experience.

Dr. Lawrence Cantow, plaintiff's psychiatrist, testified that, as a result of plaintiff's jail experience, she had feelings of humiliation, degradation,

and unworthiness. Plaintiff first visited this witness in November, 1980. He diagnosed her condition as a chronic psychotic depressive reaction. He had prescribed antipsychotic and antidepressive medication for her, and he confirmed that plaintiff had been a potential suicidal patient during her stay in jail. In his opinion, plaintiff should have been given psychiatric treatment and antipsychotic medication while she was in jail. He also opined that, if her condition had been promptly recognized and treated, plaintiff would not have been psychotic for the five-year period following her confinement in jail.

Plaintiff introduced expert testimony on the standard of practice in dealing with suicidal jail inmates. Jerome Gallagher, a psychologist and Director of Mental Health Services at the Ingham County Jail, testified that, if an inmate's clothing was taken away, jail personnel should house the inmate in an isolated area where the inmate was "not visible to the mainstream of jail activity". Gallagher maintained that Kim had committed malpractice by not seeing plaintiff after his initial visit. As for the question of medication, he stated that the physician had to assume the responsibility for the medical issue. The trial court noted for the record that this witness was not acquainted with large jails and that fact could be considered by the jury in evaluating the weight to be given to Gallagher's testimony.

Frank Donley, a facilities inspector for the Michigan Department of Corrections, testified that, when an inmate had to be stripped, the inmate was usually placed in a single cell away from the general housing unit, but the inmate should be kept under continuous observation.

The Wayne County Jail Administrator, Frank Wilkerson, testified that defendants Kim and Lebe-

devitch worked under his supervision, and he agreed that custodians and other personnel who work in the jail are Wayne County employees.

Dr. David Gendernalyk, a psychiatrist who evaluated plaintiff on defendants' behalf, testified that plaintiff was not suffering from a psychosis. He did not think she was a chronic psychotic depressive. Rather, in his opinion, she had lifelong personality problems and he characterized her personality as masochistic. Furthermore, he opined that plaintiff was not psychotic in jail because, if she had been, none of the events which allegedly took place would have "registered". Plaintiff would not have been aware of what went on. He also did not see a "close fit" between plaintiff's bad dreams symptomology and her jail experiences.

Sgt. M. A. Clipper, a female deputy assigned to the women's division, testified that the only people who would have stripped plaintiff would have been female deputies. If a male deputy had stripped plaintiff, it would have been a departure from standard procedure and wrong.

Plaintiff first claims that the trial court erred by granting a directed verdict of dismissal in favor of Wayne County on the issue of intentional infliction of emotional distress. The standard for appellate review of a trial court's decision on a motion for directed verdict is succinctly stated in *Holmes v Allstate Ins Co,* 119 Mich App 710, 713; 326 NW2d 616 (1982), *lv den* 417 Mich 1018 (1983).

"A reviewing court must review all the evidence presented to determine if a fact question exists. In doing so, this Court must view the evidence in a light most favorable to the nonmoving party, granting him every reasonable inference and resolving any conflict in the evidence in his favor. If the evidence viewed in that manner establishes a prima facie case, *i.e.,* presents a question upon which reasonable minds could differ, the

trial court's grant of a directed verdict must be reversed. *Light v Schmidt* 84 Mich App 51; 269 NW2d 304 (1978)]; *Cody v Marcel Electric Co,* 71 Mich App 714, 717; 249 NW2d 663 (1976), *lv den* 399 Mich 851 (1977)."

The "operation and maintenance of a jail is within the scope of performance of a uniquely governmental function which is accorded immunity from tort liability under provisions of MCL 691.1407; MSA 3.996(107)". *Chivas v Koehler,* 124 Mich App 195, 200-201; 333 NW2d 509 (1983), and the cases cited therein.

In *Armstead v Jackson,* 121 Mich App 239, 243; 328 NW2d 541 (1981), we determined that:

"A majority of the Supreme Court justices are in accord that intentionally tortious acts committed by agents of governmental units are not activities within the exercise or discharge of a governmental function and, consequently, not protected by governmental immunity. *Lockaby v Wayne County,* 406 Mich 65; 276 NW2d 1 (1979); *McCann v Michigan,* 398 Mich 65; 247 NW2d 521 (1976); *Shunk v Michigan,* 97 Mich App 626; 296 NW2d 129 (1980); *Antikiewicz v Motorists Mutual Ins Co,* 91 Mich App 389; 283 NW2d 749 (1979), *remanded on other grounds* 407 Mich 936 (1979)."

A governmental agency may be liable for an agent's intentional misconduct under the doctrine of *respondeat superior. Graves v Wayne County,* 124 Mich App 36, 41; 333 NW2d 740 (1983); *Gaston v Becker,* 111 Mich App 692; 314 NW2d 728 (1981).

Plaintiff alleged that defendant county intentionally inflicted emotional distress upon her as a result of her being viewed in her unclothed state by several unnamed male employees of the Wayne County Sheriff's Department. Trial testimony indicates that at least one male custodian viewed plaintiff. However, it is questionable whether male

deputies actually viewed plaintiff or assisted in stripping her.

The *Graves* Court held that Const 1963, art 7, § 6 did not exempt the county from liability under the doctrine of *respondeat superior* for a deputy sheriff's alleged wrongdoings, stating:

> "This section of the Michigan Constitution only exempts a county from any vicarious liability arising from acts of the county sheriff, not deputy sheriffs. In *Lockaby, supra,* p 77, while not directly addressing this issue, the Court said "[w]hile the county is constitutionally immune from 'responsib[ility]' for the sheriff's 'acts' that immunity does not extend to the acts of others in its employ". (Footnote omitted.) All seven justices of the *Lockaby* Court held that count I of Lockaby's complaint should be reinstated against defendant Wayne County. Count I alleged an intentional tort perpetrated against plaintiff by "unknown and unidentified officers, guards, and agents" of the defendant Wayne County Sheriff's Department. Thus, *Lockaby* strongly implies that while the aforementioned constitutional exemption applies to acts of the sheriff, it does not apply to the acts of deputy sheriffs or other employees of the sheriff." 124 Mich App 42-43.

Thus, according to *Graves,* defendant county may be held liable for acts of deputy sheriffs or other employees of the sheriff.

The first question for our determination is whether plaintiff submitted sufficient proofs to establish that defendant's unnamed agents or employees committed the tort of intentional infliction of emotional distress.

To define intentional infliction of emotional distress, this Court has adopted the standards set forth in the Restatement of Torts.[1]

---

[1] In defining the nature of an action for intentional infliction of emotional distress, this Court has adopted the standards enunciated in 1 Restatement Torts, 2d, § 46, pp 71-72:

Our review of the case law[2] discussing this intentional tort compels us to conclude that the complained-of conduct on the part of any unnamed male deputy sheriffs was not outrageous in character. The deputies who took plaintiff's clothing from her did so as a precautionary measure to protect plaintiff, who was in a suicidal state. Furthermore, even if, as plaintiff claimed, a male deputy was present when plaintiff was stripped, the record does not establish that plaintiff was viewed by other male deputies at any other time.

" '(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

" '(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress.

" '(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

" '(b) to any other person who is present at the time, if such distress results in bodily harm.'

"With regard to the requirement that the defendant's conduct be 'extreme and outrageous', § 46, comment d, p 73 of the Restatement states:

" 'It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ' '

" 'The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." (Citations omitted.) *Ledsinger v Burmeister,* 114 Mich App 12, 17-18; 318 NW2d 558 (1982).

[2] See *Holmes v Allstate Ins Co, supra; Meyer v Hubbell,* 117 Mich App 699; 324 NW2d 139 (1982), *lv den* 417 Mich 993 (1983); *Ledsinger v Burmeister,* 114 Mich App 12; 318 NW2d 558 (1982); *Fry v Ionia Sentinel-Standard,* 101 Mich App 725; 300 NW2d 687 (1980); *Mosley v Federal Dep't Stores, Inc,* 85 Mich App 333; 271 NW2d 224 (1978); *Warren v June's Mobile Home Village & Sales, Inc,* 66 Mich App 386; 239 NW2d 380 (1976).

While the incidents concerning the unidentified male custodian were most unfortunate, it is our opinion that the evidence presented was not sufficient to support a finding that the isolated incidents, in and of themselves, characterize conduct giving rise to the tort of intentional infliction of emotional distress. Therefore, neither the unnamed deputy sheriffs' conduct nor the custodian's conduct would have created vicarious liability on defendant county's part.

However, plaintiff also alleged in a separate claim of intentional infliction of emotional distress that the conduct of defendants Kim and Lebedevitch, while acting within the scope of their employment as employees of defendant county, caused plaintiff to be disrobed and remain in such a state during her confinement. We believe that the court erred in granting a directed verdict, since the dismissal of this claim ran only in favor of defendant county and not in favor of defendants Kim and Lebedevitch. Although the individual defendants were sued both jointly and severally, a finding that either or both committed the tort of intentional infliction of emotional distress would have necessitated a determination of whether defendant county could have been held liable under the doctrine of *respondeat superior.*

To explain liability under the doctrine of *respondeat superior,* the *Graves* Court quoted Justice Kavanagh's opinion in *McCann v Michigan,* 398 Mich 65, 71; 247 NW2d 521 (1976):

" 'Under the doctrine of *respondeat superior* there is no liability on the part of an employer for torts committed by an employee beyond the scope of the employer's business. *Bradley v Stevens,* 329 Mich 556, 562; 46 NW2d 382 (1951). The employer is liable, however, for the acts of his employee when the employee in acting within the scope of his authority, even though acting

contrary to instructions. *Poledna v Bendix Aviation Corp*, 360 Mich 129; 103 NW2d 789 (1960). The employer is also liable for the torts of his employee if 'the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation'. 1 Restatement Agency, 2d, § 219(2)(d), p 481. Of course, the employer is not able to instruct his employee only to act within the confines of the law, thereby insulating him from vicarious liability if the employee acts otherwise. *Anschutz v Liquor Control Comm*, 343 Mich 630; 73 NW2d 533 (1955). See, also, *Barnes v Mitchell*, 341 Mich 7; 67 NW2d 208 (1954).'

"Whether an agent of a governmental entity alleged to be liable under a *respondeat superior* theory has acted within his or her apparent authority is a question of fact. *McCann*, pp 72, 81; see *Gaston, supra*, p 701." 124 Mich App 41-42.

Proof of the agent's intentional tortious conduct sufficient to overcome the county's defense of governmental immunity will not automatically impose liability upon the county. See *Armstead v Jackson, supra*, p 244. The *Armstead* Court explained:

"There must be a secondary determination that the township was vicariously liable for the officer's acts under the doctrine of *respondeat superior*. This requires a finding that defendant Jackson was acting within the scope or apparent scope of his employment. *McCann v Michigan*, 398 Mich 65, 71-72; 247 NW2d 521 (1976); *Galli v Kirkeby*, 398 Mich 527, 538; 248 NW2d 149 (1976); *Bozarth v Harper Creed School Dist*, 94 Mich App 351, 354; 288 NW2d 424 (1979). This is a question of fact to be determined by the trier of fact. *McCann v Michigan, supra; Capitol City Lodge No 141 v Meridian Twp*, 90 Mich App 533, 538; 282 NW2d 383 (1979), *lv den* 408 Mich 856 (1980); *Lincoln v Fairfield-Nobel Co*, 76 Mich App 514, 519; 257 NW2d 148 (1977)." 121 Mich App 244-245.

Although we have determined that the trial court erred in directing a verdict in favor of Wayne County, a remand for trial on this issue is not mandated. Since the jury implicitly found that neither defendant Kim nor defendant Lebedevitch had committed the tort of intentional infliction of emotional distress, no liability on that claim could have been imposed on the defendant county.

Plaintiff's next claim is that the trial court erred in granting defendant Wayne County a directed verdict of dismissal on plaintiff's two § 1983 claims because: (1) the testimony presented at trial established that the policies and customs of the jail precipitated the invasion of plaintiff's privacy, and (2) the institutional policies enhanced the likelihood that defendants Lebedevitch and Kim would negligently fail to provide medical treatment to plaintiff and assess her psychological condition.

The liability of a municipality under § 1983 is explained in *Moore v Detroit,* 128 Mich App 491, 498-499, 502; 340 NW2d 640 (1983), as follows:

"42 USC 1983 provides in pertinent part:

" 'Every person who under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress * * *.'

"To establish a right to relief under § 1983, a plaintiff must plead and prove two elements: (1) that he has been deprived of a right secured by the Constitution and laws of the United States; and (2) that defendant deprived him of this right while acting under color of law. *Parratt v Taylor,* 451 US 527; 101 S Ct 1908; 68 L Ed 2d 420 (1981); *Paul v Davis,* 424 US 693; 96 S Ct 1155; 47 L Ed 2d 405 (1976).

"Municipalities are persons for purposes of § 1983 liability. *Monell v Dep't of Social Services of New York City,* 436 US 658; 98 S Ct 2018; 56 L Ed 2d 611 (1978); *Zmija v Baron,* 119 Mich App 524, 534; 326 NW2d 908 (1982). *A municipality cannot, however, be found liable under § 1983 on a respondeat superior theory. Monell, supra; Zmija, supra; Hays v Jefferson County,* 668 F2d 869 (CA 6, 1982). The municipality must be sued directly and liability must be based upon an official policy or custom which causes the injury. *Monell, supra,* p 694; *Zmija, supra,* p 535; *Popow v City of Margate,* 476 F Supp 1237, 1245 (D NJ, 1979). Specifically, the plaintiff must show an affirmative link between the misconduct and the adoption of any plan or policy, showing defendant's authorization for approval of such conduct. *Rizzo v Goode,* 423 US 362; 96 S Ct 598; 46 L Ed 2d 561 (1976); *Popow, supra,* p 1245; *Hays v Jefferson County, supra,* p 872.

\* \* \*

"While the Supreme Court has not set the full contours of municipal liability under § 1983, federal courts and this Court have attempted to set the parameters. See *Zmija, supra,* p 535; *Popow, supra; Hays v Jefferson County, supra.* Numerous decisions have recognized that proof of mere negligence is insufficient. See, generally, *Zmija, supra; Popow, supra; Leite v City of Providence,* 463 F Supp 585 (D RI, 1978). The applicable standard has been described as deliberate indifference, gross negligence, or recklessness. *Zmija, supra,* p 535."[3] (Emphasis added.)

Testimony at trial indicates that plaintiff was exposed to passersby of the opposite sex while she was clad only in panties. In *Fisher v Washington Metro Area Transit Authority,* 690 F2d 1133, 1142 (CA 4, 1982), the court determined that a pretrial detainee has a general right, "constitutionally pro-

---

[3] In both *Cook v Detroit,* 125 Mich App 724, 731; 337 NW2d 277 (1983), and *Moore, supra,* the panels applied the "deliberate indifference" standard to § 1983 actions involving allegations of the city's failure to properly select, train and supervise its police officers. We see no reason to apply a different standard in the case at bar.

tected, not to be subjected by state action to involuntary exposure in the state of nakedness to members of the opposite sex unless that exposure was reasonably necessary in maintaining her otherwise legal detention".[4] The question for the court's determination was whether the sheriff could be held liable under § 1983 for any deprivation of rights that may have occurred.

The *Fisher* court upheld the trial court's directed verdict in favor of the defendant sheriff:

"There is no evidence that Clements participated directly in any of the events of Fisher's detention. He cannot be held liable vicariously under § 1983 for any conduct of his subordinates. *Vinnedge v Gibbs,* 550 F2d 926 (CA 4, 1977). Neither could he be held liable on the basis of a failure adequately to supervise or control any conduct that directly caused the specific deprivation charged. *Rizzo v Goode,* 423 US 362, 370-371, 376-377; 96 S Ct 598, 603-604, 606-607; 46 L Ed 2d 561 (1976). Only if the evidence showed that conduct directly causing the deprivation was done to effectuate an official policy or custom for which Clements was responsible

---

[4] While she was housed in a cell in the women's detention center, Fisher, using her brassiere, feigned a suicide attempt. She was transferred to an isolation cell adapted for suicidal detainees/inmates. The cell, located in an area which houses male inmates, was an unfurnished room, and it contained an elevated camera that relayed a closed circuit picture to a control room located on the floor among the general population. All the walls of the control room which contained the screens used to monitor parts of the center were made of bulletproof glass.

Fisher was placed in the isolation cell naked except for her underpants and she remained in the room for approximately 15 hours. Under her § 1983 claim, plaintiff alleged "that though her stripped confinement was not 'per se * * * constitutionally improper,' her 'stripped confinement under conditions where she could be and was observed by male guards and even male inmates * * * violated her right to privacy and confined her under intolerable conditions in violation of her due process rights'". 690 F2d 1142. However, Fisher did concede "that the 'broad discretion given jailers faced with apparently suicidal detainees precludes' any claim 'that placing her in a cell and removing her clothes under appropriate conditions was a constitutional violation'". 690 F2d 1141. The court stated that it was a concession well made.

could he be liable. *Hall v Tawney,* 621 F2d 607 (CA 4, 1980); *Vinnedge v Gibbs,* 550 F2d 926. The evidence would not support such a finding.

"This is obvious when attention is focused on the specific deprivation charged. It is not, as above indicated, that Fisher was placed in a detention cell with her clothes removed following her feigned suicide attempt. That might well have been done in effectuation of a general policy respecting the treatment of such detainees for which Clements was responsible. Indeed, his own testimony probably established a willing acceptance of responsibility for such a policy. But the deprivation charged here was more narrowly the exposure to male viewing that was alleged than to have ensued. There is nothing in the evidence either directly or indirectly supporting any determination that such an exposure was also in keeping with established policy or developed custom chargeable to Clements. Instead, all the evidence on the point was to the contrary: that the policy was to protect a detainee such as Fisher whose clothing had been removed under these circumstances from indiscriminate viewing by any but female custodians. That this policy may have been violated on this occasion by unauthorized subordinate conduct—or by sheer accident beyond the control of any official—cannot be charged to Clements under developed § 1983 doctrine. *Cf. Logan v Shealy,* 660 F2d 1007 [CA 4, 1981] (strip search policy concededly that of sheriff)." 690 F2d 1142-1143.

We recognize that, in the context of the penitentiary, "the emerging case law * * * establishes a right to be free from * * * invasions of privacy". *Hudson v Goodlander,* 494 F Supp 890, 891 (D Md, 1980). "The privacy interest entitled to protection concerns the involuntary viewing of private parts of the body by members of the opposite sex." *Forts v Ward,* 621 F2d 1210, 1217 (CA 2, 1980).

In *Hudson,* the plaintiff, an inmate, alleged in his complaint "that his constitutional right to privacy was violated when female correctional

officers viewed him using the toilet, undressing, and showering". 494 F Supp 891. Although the court determined "that the plaintiff's rights were violated by the assignment of female guards to posts where they could view him while he was completely or entirely unclothed", 494 F Supp 893, it found that the plaintiff was not entitled to damages because defendants "acted reasonably, albeit incorrectly, in setting the challenged policy". 494 F Supp 895.[5]

The question for our determination is whether plaintiff showed "an affirmative link between the alleged misconduct [invasion of privacy] and the adoption of any plan or policy showing [defendant county's] authorization or approval of such conduct". *Moore, supra,* p 499.

Frank Wilkerson, the jail administrator, testified

[5] As explained in *Hudson:*

"The confrontation of existing rights highlighted in this case is not unexpected. The defendants are caught in a situation where, by attempting to insure equal employment opportunities to females, they have infringed upon the privacy rights of the inmates." 494 F Supp 891.

We note that the *Hudson* case was decided solely on constitutional grounds after the court balanced the governmental interests advanced by defendants in support of their policy assigning female guards to certain posts against the inmates' privacy interests. Even though plaintiff's rights were violated, the court denied plaintiff's claim for damages:

"As prison officials, the defendants are entitled to qualified immunity on the damage claim. However, 'the immunity defense would be unavailing * * * if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm.' *Procunier v Navarette,* 434 US 555, 562; 98 S Ct 855, 860; 55 L Ed 2d 24 (1978). An examination of the case law in this area reveals a wide disparity in the judicially mandated accommodation of equal employment opportunity policies and privacy interests of inmates. The defendants clearly attempted to conform their conduct to what they perceived to be the constitutional norm. Given the importance of each of the competing interests, and the relative dearth of clear judicial guidance in this area, the Court finds that the defendants acted reasonably, albeit incorrectly, in setting the challenged policy. Therefore, the claim for damages will be denied." 494 F Supp 894-895.

that he "set policies" or developed policies with the help of his staff for the jail, and he explained that the sheriff had to approve the policies. He indicated that there was no "policy" that permitted males to sometimes appear where the females were housed. However, he could conceive of occasions which would necessitate the presence of males (emergencies such as the evacuation of prisoners, the need for additional security measures, a shortage of staff, and maintenance problems). Wilkerson did not know if male custodians had been on the floor where defendant was housed and he stated that it was not the policy or custom to use male custodians in that area and that "it was not and is not" a regular and ordinary occurrence. Female custodians handled the women's area. Although there was a policy under which classes of professional (i.e., medical, psychiatric and sociology) students were allowed to go up on the women's floor, the policy did not include allowing students to walk by a cell housing a nude woman. However, Wilkerson opined that there could be exceptions where medical students were concerned.

Sgt. M. A. Clipper stated that men were not normally allowed in the women's division. She testified that there were occasions when males such as doctors or custodians would be present. However, it was a routine habit in the division for the deputies to announce the presence of a male, who would then be accompanied by a female who walked in front of him to make sure everything was "all right".

Const 1963, art 7, § 6 exempts the county from liability for the sheriff's acts. See *Graves, supra,* pp 42-43. According to Wilkerson's testimony, the sheriff had to approve jail policy. On this basis alone, we could find the county exempt from liabil-

ity under § 1983. However, at one point, Wilkerson, a county employee, also testified that he also "set policies".[6] It is clear that defendant county cannot be held responsible under § 1983 under the doctrine of *respondeat superior*. Therefore, applying the law as discussed in *Moore, supra,* to our review of the record, it is our opinion that any intrusions upon plaintiff's privacy were not the

---

[6] In *Avery v Burke County,* 660 F2d 111 (CA 4, 1981), the plaintiff sued the county, the county board of health, the county board of social services and various individual medical personnel. The plaintiff alleged that the defendants wrongfully caused her sterilization after informing her that she had the sickle cell trait. Under North Carolina law, neither the board of health nor the board of social services could be sued as a separate entity. Therefore, the court determined that if plaintiff was entitled to recover damages under § 1983, because of the conduct of the respective boards, the county would be held liable since the boards were extensions of the county.

The court explained that the county and boards may be liable under § 1983 if their policies or customs actually caused plaintiff's injuries. However, the plaintiff did not have to prove that members of the boards expressly authorized or participated in her sterilization.

"Official policy may be established by the omissions of supervisory officials as well as from their affirmative acts. In *Withers v Levine,* 615 F2d 158 (CA 4, 1980), we held that supervisory officials charged with the responsibility of making rules may be subject to § 1983 liability where their unreasonable failure to make rules causes their employees' unconstitutional practices. Accord *Dimarzo v Cahill,* 575 F2d 15, 17-18 (CA 1, 1978). Thus the conduct of the boards may be actionable if their failure to promulgate policies and regulations rose to the level of deliberate indifference to Avery's right of procreation or constituted tacit authorization of her sterilization. See *Estelle v Gamble,* 429 US 97, 105-106; 97 S Ct 285, 291-292; 50 L Ed 2d 251 (1976); *Turpin v Mailet,* 619 F2d 196, 201 (CA 2, 1980); Note, *Municipal Liability Under Section 1983: The Meaning of 'Policy or Custom,'* 79 Columbia L Rev 304, 309-318 (1979). This issue generally is one of fact, nor law. See *Turpin,* 619 F2d 210.

"A single incident or isolated incidents are normally insufficient to establish supervisory inaction upon which § 1983 liability may be based. *Woodhous v Virginia,* 487 F2d 889 (CA 4, 1973)." 660 F2d 114.

In the instant case, as compared to *Avery v Burke County,* the county and defendants Lebedevitch and Kim were named as defendants. The plaintiff herein did not sue the sheriff, nor did she sue the jail administrator or any deputies. Therefore, even if Wilkerson should have promulgated a policy with respect to permitting males on the women's floor, but did not, we believe that defendant county could not be held liable because of Wilkerson's inaction since the failure to promulgate such a policy does not appear to us to rise to the level of deliberate indifference to the plaintiff's right to privacy.

result of a policy authorized or approved by defendant county. Furthermore, we find that the record does not reflect a "deliberate indifference" to plaintiff's constitutional right to privacy on the part of defendant county. Therefore, we hold that the trial court did not err in directing a verdict in favor of defendant county on this portion of plaintiff's § 1983 claim.

Plaintiff also argues that defendant county was liable under § 1983 because defendant's policies contributed to the denial of plaintiff's medication and the negligence of defendants Kim and Lebedevitch.

This Court in *Brewer v Perrin,* 132 Mich App 520, 529-530; 349 NW2d 198 (1984), reviewed what was necessary to state a valid § 1983 claim for failure to provide necessary medical care and treatment to a person being held in jail:

"Such a cause of action is allowed under § 1983 if the plaintiff alleges 'acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs'. *Estelle v Gamble,* 429 US 97, 106; 97 S Ct 285, 292; 50 L Ed 2d 251, 261 (1976).[3] Every prisoner has the right to receive medical care under circumstances in which a reasonable person would seek medical care. *Rust v Alaska,* 582 P2d 134, 143, fn 34 (Alas, 1978). Prison or jail authorities must make available a level of medical care reasonably designed to meet the inmate's routine and emergency health care needs. *Ramos v Lamm,* 639 F2d 559, 574 (CA 10, 1980), *cert den* 450 US 1041; 101 S Ct 1759; 68 L Ed 2d 239 (1981). A prisoner is entitled not only to have his physical needs met, but also to have his psychological needs met. *Inmates of Allegheny County Jail v Pierce,* 612 F2d 754 (CA 3, 1979); *Bowring v Godwin,* 551 F2d 44, 47 (CA 4, 1977).

"In evaluating a plaintiff's claim of failure to provide necessary medical care and treatment, courts use a two-step test: 'It requires deliberate indifference on the part of [the] officials and it requires the prisoner's medical

needs to be serious.' *West v Keve,* 571 F2d 158, 161 (CA 3, 1978).

"*Hendrix v Faulkner,* 525 F Supp 435, 454 (ND Ind, 1981), explained the second of these requirements: 'A medical need is serious if it is "one that had been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Laaman v Helgemoe,* 437 F Supp 269, 311 (D NH, 1977).'

"[3] *Estelle* is an Eighth Amendment case. Because Gary was merely a detainee, the Eighth Amendment does not apply. *Bell v Wolfish,* 441 US 520, 535, fn 16; 99 S Ct 1861; 60 L Ed 2d 447 (1979). However, Eighth Amendment analysis provides useful analogies to plaintiff's due process claim; due process protects a detainee from abusive treatment. *Meshkov v Abington Twp,* 517 F Supp 1280, 1284 (ED Pa, 1981). Moreover, '[i]t would be anomalous to afford a pretrial detainee less constitutional protection than one who has been convicted.' *Hampton v Holmesburg Prison Officials,* 546 F2d 1077, 1079-1080 (CA 3; 1976)."

The *Brewer* panel explained that to show deliberate indifference, "a plaintiff must 'show either denied or unreasonably delayed access to a physician for diagnosis or treatment of a discomfort-causing ailment, or failure to provide prescribed treatment'". See, also, *Brewer, supra,* p 530; *Todaro v Ward,* 431 F Supp 1129, 1133 (SD NY, 1977); *Ramos v Lamm,* 639 F2d 559, 575 (CA 10, 1980).

In the instant case, plaintiff testified that she needed her epilepsy medication on a daily basis. She also testified that she only received the medication during the first two days of her confinement. However, it is unclear from the record whether she received the medication during the first two or last two days of confinement. Furthermore, testimony indicates that it was the policy of the jail to take from any incoming detainees medicine they brought with them and had in their possession as a safety precaution until the medical

staff could evaluate the individual needs of the detainee. Thus, the medicine plaintiff brought with her was confiscated. Wilkerson testified that the medical department was responsible for dispensing medication and medical policy. Kim's testimony indicated that the dispensing of this medication was a medical matter within Lebedevitch's authority.

In our opinion, the record does not adequately show that the complained-of conduct, deprivation of allegedly essential medication, was a result of defendant county's policy or custom or a "deliberate indifference" on the part of defendant county. However, we believe that the evidence presented at trial may have been sufficient to permit this issue to go to the jury on the § 1983 claims against the individual defendants, Kim and Lebedevitch, but that the evidence, at most, would only have established a *respondeat superior* claim against defendant county, a basis of liability which is not cognizable under § 1983. Therefore, we hold that the trial court did not err in directing a verdict in favor of defendant county on this portion of plaintiff's § 1983 claim.

Plaintiff also claims error in the trial court's decision to exclude three exhibits from the jury room. "[T]aking of exhibits to the jury room lies within the discretion of the trial judge * * * without regard to the testimonial or non-testimonial nature of the items at issue." *Socha v Passino,* 405 Mich 458, 471; 275 NW2d 243 (1979). The exhibits in question consisted of two circuit court opinions and a circuit court order. Plaintiff asserts that prejudice resulted from exclusion of the exhibits, since the documents set forth the duties and obligations of defendants Kim and Lebedevitch. The record discloses that the jury was fully informed in open court on this issue and, under these circum-

stances, no prejudice could have resulted. *Silverstone v London Assurance Corp,* 187 Mich 333, 343; 153 NW 802 (1910); *Metcalf v Waterbury,* 60 Mich App 553, 558; 231 NW2d 437 (1975), *lv den* 394 Mich 821 (1975). There was no abuse of discretion.

Plaintiff's fourth claim is that the trial court erred in its refusal to allow plaintiff to belatedly read from defendant Kim's deposition. Although the trial judge refused to allow plaintiff's counsel to read from defendant Kim's deposition after Kim had been excused as a witness, the judge gave counsel an opportunity to submit the particular questions he wished to read. Counsel failed to avail himself of this opportunity. It is apparent from the record that counsel claimed a right to read freely from the deposition. There is no such right. Rather, a deposition may be used to impeach a party-witness "so far as admissible under the rules of evidence". GCR 1963, 302.4. A witness may be impeached through use of his prior inconsistent statement only if counsel lays a proper foundation. MRE 613(a). In the instant case, plaintiff had a clear chance to impeach Kim with the deposition and did so at one point in a proper manner. Counsel then waited for the witness to be excused before attempting to extrinsically impeach Kim with the deposition. If permitted, this method would have been improper. We find no error in the trial court's ruling.

We also find that the trial court did not err in allowing cross-examination by defense counsel relative to the nature of criminal charges which had been brought against plaintiff's witness and members of plaintiff's family. Plaintiff opened the door to the testimony to which she now assigns error. "A witness may be cross-examined on any matter relevant to any issue in the case, including credi-

bility." MRE 611(b). Wagner's assertion that she was in jail for second-degree murder was a misrepresentation. Thus, defendants were not required to allow her assertion to go unanswered.

The criminal charges against plaintiff's family were initially brought to the jury's attention by plaintiff on direct examination. "[H]aving herself opened the door to that testimony, she cannot now complain because defendant thereupon more fully developed the subject matter." *LaLonde v Roman Standard Life Ins Co,* 269 Mich 330, 333; 257 NW 834 (1934).

We have reviewed the record and certain complained-of statements in the context in which they were made. We conclude that the trial judge acted with restraint in the face of various questionable tactics employed by plaintiff's attorney and that the trial judge made no remarks which could have conceivably prejudiced the jury in favor of the defendants.

Plaintiff also alleges error in the jury instructions. The court correctly instructed the jury on the defective building theory of liability by reading the statute. The allegedly erroneous instructions cited by plaintiff were given in conjunction with the court's instructions on intentional infliction of emotional distress. Since the court had already directed a verdict in favor of defendant county on that issue, the instructions should not have been given. Nevertheless, the jury's decision on the building defect claim could not have been affected by these superfluous instructions. Accordingly, the error was harmless beyond a reasonable doubt.

Plaintiff's final contention is that reversal is required due to contact between the bailiff and the jury during deliberations. We find no merit to this claim.

The record herein reveals that the bailiff gave

no instructions to the jury on any legal or evidentiary issue. While all attorneys were still present in the courtroom, the bailiff responded to a knock on the jury room door and he momentarily entered the threshold of the jury room. The bailiff later testified that, when various jurors began to ask him questions, he simply told them to write a note for the judge.

In Michigan there is a strict rule prohibiting communication with a deliberating jury outside of the courtroom and the presence of counsel. *People v Cain,* 409 Mich 858; 294 NW2d 692 (1980), *rev'g* 94 Mich App 644; 288 NW2d 465 (1980); *People v Kangas,* 366 Mich 201; 113 NW2d 865 (1966); *People v Washington,* 119 Mich App 373, 375; 326 NW2d 514 (1982). In *Cain, supra,* the bailiff took to the judge a note from the jury which inquired whether the verdict need be unanimous. 94 Mich App 645. At the judge's direction, the bailiff told the jury their verdict had to be unanimous. The Supreme Court reversed the subsequent conviction.

A fair reading of the above cases indicates that reversal is required where any instruction is given to the jury after the commencement of deliberations, other than in open court in the presence of counsel.

In *Wilson v Hartley,* 365 Mich 188, 189; 112 NW2d 567 (1961), the judge, through his clerk, instructed the jury ex parte as to the proper form to be used in rendering its verdict. The Supreme Court, noting "[t]he communication here in question and the answer thereto did not pertain to any phase of the case bearing upon plaintiff's right to recover", found no prejudice. 365 Mich 190. Accord *Mason v Lovins,* 24 Mich App 101, 115-116; 180 NW2d 73 (1970).

In this case, there is absolutely no possibility

that the bailiff could have swayed the jury in any manner by telling them to write a note to the judge. Such was the proper thing to do under the circumstances.

Affirmed. We do not retain jurisdiction.