**Lawrence J. KORB, Plaintiff–Appellant,**

v.

**John F. LEHMAN, Jr.; Everett Pyatt; Melvyn R. Paisley, Defendants–Appellees,**

and

**Carl M. Smith, Defendant.**

**No. 88–1746.**

United States Court of Appeals, Fourth Circuit.

Argued March 9, 1989.

Decided Nov. 26, 1990.

As Amended Dec. 6, 1990.

As Amended Jan. 9, 1991.

Kate Martin, argued, American Civil Liberties Union Foundation, Washington, D.C., for plaintiff-appellant.

Robert S. Bennett argued (Amy Sabrin, Dunnells, Duvall, Bennett & Porter, Washington, D.C., on brief), for defendant-appellee Lehman.

Coleman S. Hicks, Covington & Burling, Washington, D.C., for defendant-appellee Pyatt.

Robert Plotkin, argued (E. Lawrence Barcella, Jr., on brief), Laxalt, Washington, Perito & Dubuc, Washington, D.C., for defendant-appellee Paisley.

Before RUSSELL and SPROUSE, Circuit Judges, and STAKER, District Judge for the Southern District of West Virginia, sitting by designation.

STAKER, District Judge:

The appellant, Dr. Lawrence J. Korb, appeals from the dismissal of his *Bivens* claim [1] against the appellees, John F. Lehman, Melvyn Paisley, and Everett Pyatt, which sought compensatory and punitive damages for the alleged violation of his First Amendment rights. For the reasons set forth below, we affirm.

## I.

Dr. Korb served as President Reagan's Assistant Secretary of Defense (Manpower, Installations and Logistics) from 1981 to 1985. After he resigned his Defense Department position in September of 1985, Korb was hired by Raytheon Corporation as Vice President in charge of the Washington, D.C., office. In that position, Korb was responsible for Raytheon's relations with Congress and various government departments, including the Department of Defense.

Despite his reputation as a champion of President Reagan's arms build-up policy, Korb joined the Committee for National Security (CNS), a group of private citizens organized to encourage informed debate about national security issues. The group, which includes former Defense Department officials and military officers, publishes an annual alternative defense budget that is largely critical of the amount of monies spent on national defense. Korb's CNS membership was approved by Raytheon.

In February of 1986, Korb spoke at a news conference to announce the publication of CNS' alternative defense budget. At that conference, the events of which were chronicled in local newscasts and a *Washington Post* news article, Korb called for a reordering of priorities and suggested a $200 billion reduction in defense spending over a period of five years to be accomplished, in part, by scaling back a planned 600–ship, 15–carrier Navy fleet. This planned Navy build-up was strongly supported by the Secretary of the Navy, John Lehman. The *Washington Post* article, entitled "Pentagon Ex–Defender Turns Critic" [2] identified Korb as "a private citizen working for arms-maker Raytheon Co."

Reports of the press conference soon reached both the Department of Defense and Raytheon. Upon reading the *Washington Post* article, Secretary Lehman met with members of his staff and expressed his indignation about Korb's remarks and his belief that a company under contract to the Navy might be advancing programs that would seriously impair national defense. However, Lehman made no representation that he would seek retribution against either Korb or Raytheon, and at no time during the meeting did he encourage his subordinates to pursue the matter with Korb's superiors. Meanwhile, at Raytheon, there was also concern about Korb's activities. Several executives felt that the statements attributed to Korb were not appropriate for a Raytheon employee and that the company would be inexorably associated with the well-publicized views of Korb.

Shortly after the conclusion of Secretary Lehman's meeting, two staff members who were in attendance, Melvyn R. Paisley, As-

---

**1.** *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**2.** *Washington Post,* Pg. A17, Col. 2, Wednesday, Feb. 26, 1986.

sistant Secretary of the Navy (Research, Engineering and Systems), and Everett Pyatt, Assistant Secretary of the Navy (Shipbuilding and Logistics), called Raytheon executives to voice their displeasure with Korb's statements. Paisley, believing Korb's position to be contrary to that taken by Raytheon in earlier meetings with Navy officials, called R. Gene Shelley, a senior vice president of Raytheon and well-known business associate. During that call, Paisley was frank in his criticism of Korb, averring that a Raytheon official ought to be careful about talking in a public forum because of the possibility of inaccurate reporting. At no time during the conversation did Paisley suggest that Raytheon take any punitive action against Korb. In fact, in a follow-up letter dated March 19, 1986, Paisley communicated to Shelley his belief that the entire matter had been resolved to his satisfaction.

Also on February 26, 1986, Pyatt called Dennis Picard, senior vice president and general manager of Raytheon's missile division. During that conversation, Pyatt expressed his dismay about the positions attributed to Korb—in particular, the claim that $200 billion could be cut from defense spending over the next five years and the contention that the Navy's commitment to build and staff 600 ships could be abandoned, without affecting the security of the United States. Pyatt also informed Picard that the Navy is not permitted to absorb a contractor's lobbying expenses as reimbursable costs, and that, through the payment of general overhead accounts, the Navy was, in effect, contributing to a portion of Korb's Raytheon salary. Pyatt did not demand, request, or suggest that Raytheon take any personnel action regarding Korb. Nor does the record before us reflect that Pyatt attempted to intimidate, coerce, or threaten Picard or Raytheon in any way.

During subsequent interviews conducted during an investigation into this matter, both Picard and Shelley indicated that they did not consider the telephone calls to be inappropriate in any way. And, although Secretary Lehman did not ask Paisley or Pyatt to contact Raytheon directly, he did express approval upon learning that the calls had been made.

Picard and Shelley both contacted Korb's principal supervisor, Philip Phalon, to express their own dissatisfaction with Korb's news conference and to report on the Navy's reaction. Phalon was the individual principally responsible for the hiring of Korb. In the months preceding the news conference, both he and several other high-ranking Raytheon officials had become increasingly dissatisfied with the way in which Korb performed his job. Specifically, Phalon took exception to Korb's regular absence from the office, the result of speaking engagements around the country. Further, Phalon was angered by a network evening news program on which Korb appeared making comments that were critical of the then unannounced federal defense budget. That particular interview was taped in Raytheon's Washington, D.C., office.

Concluding that Korb was not the right man for the job, Phalon made an initial determination to terminate him. Admittedly, the calls from the Navy were a factor considered by Phalon in making such a decision. However, those calls were not determinative. Phalon described the events leading to Korb's demise as follows: "Dr. Korb's departure from [Raytheon was] part of a continuum. It was not triggered by Navy calls. Nor [were such calls] a decisive moment in time for Dr. [Korb] and his relationship with Raytheon Company." This sentiment was echoed by J. Brainard Holmes, then president of Raytheon, who testified he too was generally dissatisfied with the manner in which Korb performed his job.

Although Secretary Lehman was frank in his comments about Korb's actions, stating that he "had every hope Raytheon would tell [Korb] to shut up and stop testifying against its principal customer," upon hearing of Korb's impending termination, Lehman called Holmes to reiterate that the Navy could continue to work with Korb and to urge Holmes to reconsider the deci-

sion to dismiss Korb. Holmes assured Lehman that Raytheon would take the Secretary's views into consideration, but that a decision based upon Korb's entire employment record would be made.

Ultimately, against the articulated wishes of Lehman, Paisley and Pyatt, Raytheon decided to offer Korb another position in Philadelphia, which he declined to accept. Shortly thereafter, at the request of Congress, the Department of Defense conducted an investigation into the affair headed by Special Inquiries Investigator Lieutenant Colonel R.P. Jones, USAF. At the conclusion of the investigation, Jones reported that there was no evidence to suggest that Navy officials either requested or intended that Korb be fired. Further, according to the report, Korb's departure from Raytheon was not solely attributable to the complaints by Paisley and Pyatt, but rather to a combination of factors that included the complaints of the Navy officials, as well as complaints from a staff member of the Senate Armed Services Committee, Carl M. Smith, and other Raytheon executives.

## II.

In dismissing this action prior to trial, Fed.R.Civ.P. 12(b)(6), the district court relied on alternative grounds. The court held that "when the defendants' alleged conduct is judged 'in light of pre-existing law,' what is 'apparent' is that the conduct was entirely appropriate and lawful." *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). It decided, therefore, that "plaintiff's allegations fail to state a claim of violation of clearly-established law and defendants are ... protected by qualified immunity." *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1987). Alternatively, the court held that "[a] plaintiff seeking damages for a constitutional tort must prove causation in fact, *Beard v. O'Neal,* 728 F.2d 894, 898 (7th Cir.1984), *cert. denied,* 469 U.S. 825 [105

S.Ct. 104, 83 L.Ed.2d 48] (1984), and government officials may not be held liable where the harm suffered by the plaintiff was 'too remote a consequence' of the official conduct. *Martinez v. California,* 444 U.S. 277, 285 [100 S.Ct. 553, 559, 62 L.Ed.2d 481] (1980)."

Because this was a decision based solely on the pleadings and supporting materials, our review of the record before us is *de novo,* and we are constrained by the standard employed by the district court. Fed. R.Civ.P. 56(c); *Pachaly v. City of Lynchburg,* 897 F.2d 723 (4th Cir.1990). We may, however, affirm on any ground fairly supported by the record. *Lee v. United States,* 809 F.2d 1406, 1408 (9th Cir.1987). After reviewing the record before us, we believe that the district court correctly dismissed Korb's cause of action and, without reaching the issue of causation in fact, affirm on the basis that the appellees were protected by qualified immunity.

## III.

In almost any action against a government official involving an alleged deprivation of constitutional rights a court is presented with a threshold question of the defendant's immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). This type of immunity is generally referred to as qualified immunity. *Id.* at 807, 102 S.Ct. at 2732. Except for certain specified exceptions, this is the form of immunity applicable to federal executive officials. *Id.* Qualified immunity not only shields a government official from liability for damages but it will also shield him or her from having to stand trial. *Mitchell v. Forsyth,* 472 U.S. 511, 526–27, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985). Consequently, the question of immunity is independent of the merits of a plaintiff's claim,

*id.* at 527–28, 105 S.Ct. at 2816–17, and may be decided in the early stages of litigation, even prior to discovery. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *accord, Turner v. Dammon,* 848 F.2d 440, 443 (4th Cir.1988). This is what the district court did in this case, finding that the appellees were immune from suit because their conduct did not violate clearly established law. District Court's Memorandum Opinion, Joint Appendix at 205, 212–17.

The central question in determining the issue of qualified immunity is whether or not the conduct of the government official violated "clearly established law," *i.e.,* the " 'objective legal reasonableness' of [his] action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken...." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 640, 107 S.Ct. at 3039 (citations omitted). "[U]nder [this] test, an official may be entitled to immunity from suit even where he has violated a plaintiff's rights—if [those rights] were not then 'clearly established' or if a 'reasonable person' in the official's position could have failed to appreciate that his conduct would violate them." *Collinson v. Gott,* 895 F.2d 994, 998 (4th Cir.1990) (per curiam) (Judge Phillips concurring) (citation omitted). A court, in making the determination as to whether a constitutional right has been violated, should not look at the right at its most general level but at "its application to the particular conduct being challenged." *Id.* (citation omitted); *Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3038–39. If there exists a "legitimate question" as to whether particular conduct violates a particular right then the right is not clearly established and qualified immunity applies. *See Tarantino v. Baker,* 825 F.2d 772, 775 (4th Cir.1987).

The conduct being challenged herein is the appellees' contact with officials of Korb's employer in order to express their displeasure with and criticism of Korb for his *public* critical comments regarding the proposed Department of Defense budget and allegedly to cause his employer to fire him for making such comments. Korb contends that this conduct violated his First Amendment right of free speech. The district court found that the appellees were entitled to qualified immunity because no statute or agency rule or regulation prohibited the conduct alleged. Furthermore, case law, *Donohoe v. Watt,* 546 F.Supp. 753 (D.D.C.1982), *aff'd mem.,* 713 F.2d 864 (D.C.Cir.1983), had held that high-level government officials had the right to communicate to entities doing business with their department adverse comments concerning the entities' representatives. *Id.* at 756. Thus, the unlawfulness of the appellees' conduct was not clearly established. Joint Appendix at 216–17.

The protection of citizens' right to speak publicly on matters of public concern, such as the nation's defense budget, is at the very heart of the First Amendment. *First National Bank v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 1415, 55 L.Ed.2d 707 (1978). On such matters "free and open debate is vital to informed decision making...." *Pickering v. Board of Education,* 391 U.S. 563, 571–72, 88 S.Ct. 1731, 1736, 20 L.Ed.2d 811 (1968). The Supreme Court has said that it is essential to protect the rights of persons having special knowledge or expertise to speak on an issue of public concern. *Id.* at 572, 88 S.Ct. at 1736. " '[S]tatements criticizing public policy and the implementation of it must be similarly protected.' " *Rankin v. McPherson,* 483 U.S. 378, 387, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987) (citations omitted). It is for this reason that the Supreme Court has held that government officials may not retaliate against *public* employees for speaking on matters of public concern. *E.g., id.; Pickering, supra.* We see no reason why the same protection should not extend to employees of private entities.

"[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment...." *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959). The actions of government officials which cause a private employee to be deprived of his employment give rise to a *Bivens*-type action against those officials for violation of due process. *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir.1987). We believe a *Bivens* action should also exist when government officials cause a *private* employee to be fired by his *private* employer for exercising his First Amendment right to speak out on matters of public concern. *Cf. Reuber v. United States*, 750 F.2d 1039, 1054–59 (D.C.Cir. 1985) (private employee has *Bivens*-type cause of action against his employer—a government contractor—for violation of First Amendment rights when disciplinary action taken against plaintiff at behest of and in conjunction with government officials). Government officials may "offer adverse commentary upon the integrity, competence, judgment or discretion," *Donohoe*, 546 F.Supp. at 756, of a private employee. Even if it ought to be the law that such officials may not seek to retaliate against a private employee through his private employer solely for his exercising his First Amendment rights; however, such was not clearly established to have been the law when appellees committed the acts of which Korb complained.

Given what we have just said, what is clear is that at the time the conduct alleged in the complaint occurred, there was no law declaring that such conduct might give rise to a constitutional violation. In fact, the contrary was indicated. *Donohoe, supra*. The district court, therefore, was correct in finding that the appellees did not violate "clearly established" law and were thus protected from suit by qualified immunity. The judgment of the district court in dismissing this action is

AFFIRMED.

SPROUSE, Circuit Judge, dissenting:

I respectfully dissent, feeling that the defendants are not entitled to qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 and *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523.