**Douglas Scott AREY**

v.

**Secretary Bishop L. ROBINSON, Commissioner Richard A. Lanham, Warden Thomas R. Corcoran, and Lt. Sandra Smith.**

Civ. No. Y–90–3009.

United States District Court,
D. Maryland.

July 8, 1992.

Leslie L. Gladstone, Baltimore, MD, for plaintiff.

Audrey J.S. Carrion, Asst. Atty. Gen., Baltimore, MD, for defendants.

## ORDER

JOSEPH H. YOUNG, Senior District Judge.

Having considered the objections filed by both parties to the report and recommendation issued April 3, 1992, by Magistrate Judge Catherine C. Blake, and having made a *de novo* determination as to all matters covered by those objections, it is hereby this 7th day of July, 1992, **ORDERED** that:

1. the proposed findings and recommendations of Magistrate Judge Blake are accepted;

2. the report and recommendation is affirmed and adopted;

3. the State is hereby directed to expunge the Rule 14 conviction from Mr. Arey's record and to have his classification reconsidered by officials not involved in the 1990 incidents or the 1990 classification and transfer decisions that are the subject of this suit; and

4. judgment is hereby entered finding that Mr. Arey's constitutional rights to privacy and due process were violated as stated in the Report and Recommendation but denying monetary relief and finding in favor of the defendants on all other claims.

## REPORT AND RECOMMENDATION

BLAKE, United States Magistrate Judge.

Douglas Scott Arey, a Maryland prison inmate, filed this action on November 16, 1990 pursuant to 42 U.S.C. § 1983. Mr. Arey, who is represented by counsel, alleges that his right to privacy was violated by the defendants and that he was wrongfully found guilty of violating several disciplinary rules. He seeks compensatory as well as injunctive relief. Named as defendants are Secretary Bishop L. Robinson, Commissioner Richard A. Lanham, Warden Thomas R. Corcoran, and Lt. Sandra Smith.

An evidentiary hearing was conducted on September 4, 5, 23, 1991, and October 10, 1991. Counsel submitted various post-hearing memoranda, the last of which was received November 15, 1991.[1] I will recommend that Mr. Arey's claims be granted in part and denied in part as set forth below.

Mr. Arey, who has been incarcerated since May 9, 1973 serving a life sentence, was placed on work-release status in September 1988. He held several jobs in the community while on that status.

The Maryland Correctional Pre–Release System ("MCPRS") includes approximately ten institutions throughout the state. Defendant Corcoran supervises those institutions. In the summer of 1990, Mr. Arey was housed at the "old" Jessup Pre–Release Unit ("JPRU") on work-release status. Construction of the "new" JPRU was nearing completion. Mr. Arey, as well as a number of other inmates scheduled to be transferred to the new JPRU in September, had various con-

---

[1] This case was referred to me by Judge Joseph H. Young on March 14, 1991, pursuant to 28 U.S.C. § 636 and Local Rule 301. I issued a report and recommendation on May 9, 1991, recommending denial of the defendants' motion to dismiss or for summary judgment. The report and recommendation was affirmed and adopted by Judge Young on May 23, 1991.

cerns about the new institution. Of particular relevance to this case is the asserted lack of privacy for inmates provided by the toilet and shower facilities in the new JPRU.

At the old JPRU, the bathroom area was completely enclosed by full solid walls and a door. Inside the bathroom area, the urinals were separated by five to five and a half foot tall partitions, and the showers had curtains. (See Plaintiff's Exh. 13). By contrast, in the new JPRU the toilets, urinals, and showers are located along one end of a dormitory-style room and are screened from view only by a wall approximately 48½ to 50 inches high in which there are open entry ways. (Plaintiff's Exh. 3). There are no doors, shower curtains, or privacy screens of any kind. Approximately 70 inmates, each allotted a bed and one locker, sleep in four rows. (See Plaintiff's Exh. 4). A raised, bubble-type control room for the correctional officers is located at the opposite end of the dormitory room affording a full view of the beds and the bathroom area approximately 70 feet away. Over the summer of 1990, correctional officials met with various inmates to discuss the transition to the new JPRU. Mr. Arey orally expressed his concerns at a meeting on August 5, 1990, and was told by Assistant Commissioner Mazzone to put those concerns in writing. Mr. Arey did so in a letter dated August 5, 1990. (Plaintiff's Exh. 14). Assistant Warden Thomas Filbert called a special meeting on August 15, 1990, as a result of Mr. Arey's letter. After the meeting, which was not attended by Mr. Arey, a letter from the inmate advisory council read and signed by Mr. Arey was sent to Assistant Commissioner Mazzone. (Plaintiff's Exh. 15). Another meeting was held in early September 1990.[2]

Mr. Arey and other inmates also contacted the Prisoner Assistance Project of the Legal Aid Bureau, Inc. Attorney Frances E. Kessler requested and was granted permission to tour the new JPRU on August 27, 1990, accompanied by the unit manager, Thomas Passaro, Assistant Warden William Filbert, and other staff members. She expressed to Mr. Passaro, Mr. Filbert and Captain Deborah Lilley her concerns over the lack of privacy, particularly in the shower area. According to her observations, from the walkway running directly in front of the bathroom area along the end of the dormitory, a correctional officer could see the full body of an inmate in the shower area, and also could see the genital area of inmates using the toilets or urinal. From the control booth, a correctional officer could see an inmate from the waist up; the genital area, however, was shielded by the privacy wall.[3]

Ms. Kessler raised the possibility of hanging semi-opaque shower curtains from the ceiling to the top of the bathroom wall, and was told that possibility would be considered. She also was told by Captain Lilley that there would be a shower schedule establishing times when female correctional officers would not enter the dormitory. She was not given a copy of such a schedule at that time.

Ms. Kessler wrote to Mr. Passaro and Mr. Filbert on September 5, 1990, regarding the privacy issue. (Plaintiff's Exh. 5). On September 12, 1990, at the request of Mr. Passaro, she forwarded copies of the cases related to inmates' rights to privacy cited in her September 5, 1990 letter. (Plaintiff's Exh. 7). In Ms. Kessler's letter of September 5, she stated "I simply cannot predict how a court would rule on the set up at the new unit." She encouraged Mr. Passaro and Mr. Filbert to seek advice from the Attorney General's office. (Plaintiff's Exh. 5).

Ms. Kessler kept Mr. Arey advised concerning her discussion with JPRU officials. She also recommended that he attempt to resolve any particular problems informally with the officer involved before filing a written administrative remedy request. (See

**2.** In a letter from Assistant Commissioner Mazzone to Mr. Arey dated September 17, 1990, Warden Corcoran was requested to look into Mr. Arey's concerns. (Plaintiff's Exh. 16).

**3.** Ms. Kessler's testimony concerning the visibility of inmates from the control booth and from the walkway at the end of the dormitory immediately adjacent to the bathroom wall was confirmed by the photographs admitted as Plaintiff's Exhibit 2 and was not contested by the defendants. It also was confirmed by my visit to the new JPRU on October 4, 1990, done at the request of defense counsel with agreement of counsel for Mr. Arey.

Compl., Kessler Affid. ¶ 12, citing DCR 185–2).

Inmates were transferred to the new JPRU on September 4, 1990. No shower curtains or other modifications to the bathroom area had been installed. Unit Manager Passaro and Assistant Warden Filbert apparently decided together not to attempt the use of shower curtains, believing that the curtains would not stay up or would tear and need to be replaced. Captain Deborah Lilley testified that there was a shower schedule in effect as of September 4, 1990, indicating that female officers would not conduct security rounds in housing unit 3 from 6:00 a.m. to 8:30 a.m., 4:30 p.m. to 7:00 p.m., and 10:00 p.m. to 12:30 a.m. (*See* Plaintiff's Exh. 1A).

The testimony indicated some discrepancy in the understandings as to when a female officer was required to announce herself. Apparently the policy at the old JPRU required a female officer to announce herself only when entering the shower and bathroom area. Lt. Sandra Smith believed this still to be the policy at the new JPRU; Assistant Warden Filbert stated that female correctional officers were to announce themselves as they approached the bathroom area. These directives were not in writing at the time of the incident involving Mr. Arey.

On September 24, 1990, Mr. Arey was assigned to bed # 2E in housing unit 3. He was scheduled to begin a new work-release job at MacMillan Bloedel Containers that afternoon. (Plaintiff's Exh. 33). He woke early but then went back to sleep, getting up again at approximately 9:50 a.m. At that time, the female correctional officer assigned to the dorm who had previously been in the control bubble was relieved by a male officer, Officer Marcus Bell. Mr. Arey then went to use the bathroom facilities. As he was standing at the urinal directly behind the privacy wall talking to the inmate using the toilet on his left, that inmate became silent. When Mr. Arey looked to the right, he saw Lt. Sandra Smith facing him less than a foot away. She was in the walkway making rounds in the dormitory. Mr. Arey had heard no announcement of her entry into the dorm or of her approach down the walkway.

Mr. Arey testified that he asked her why she did not announce herself and whether she was aware of the court case called *Hudson v. Goodlander.*[4] When she continued walking, he closed his pants, washed his hands, and came out of the bathroom area wanting to make an objection to what had just occurred. According to Mr. Arey, he "kept after her" and kept approaching her as she was going up the aisle away from him, continuing to ask whether he could speak with her. He also asked her if she was familiar with Captain Lilley's memo regarding shower schedules. Although she was within hearing distance, she did not respond. Mr. Arey denied getting "louder" but admitted he "projected" his voice further. Other inmates gathered to listen to the discussion. According to Mr. Arey, Lt. Smith suggested he put his objection in writing. When Mr. Arey continued to try to discuss the matter, she said she did not have time but that if he wanted to discuss it, he should meet her in the hallway and not continue a public conversation. Mr. Arey agreed to meet Lt. Smith in the hallway after he put on his shoes and a different shirt.

Mr. Arey did not find Lt. Smith in the hallway immediately outside the dormitory. Told by other correctional officials that she had gone outside, Mr. Arey also went out into the courtyard. Lt. Smith told him to go to a classroom to wait if he wanted to speak with her. According to Mr. Arey, he waited for a number of hours until she finally came to speak with him after lunch. During that time he returned to the housing unit to make sure she still wanted to speak to him.

When Lt. Smith spoke to him she stated, according to Mr. Arey, that she was giving him a ticket because "things are out of my hands now." She also asked him for his identification card. Mr. Arey did not have it with him. He testified at the hearing that he had not expected to be out of the housing unit and that his identification badge had been turned in to a correctional officer in the control room when he borrowed a chess set.

4. 494 F.Supp. 890 (D.Md.1980).

On cross-examination, Mr. Arey testified that he did not believe Lt. Smith wanted to see him unclothed, and that it was probably as much a surprise to her as it was to him.[5]

Several other inmates observed portions of the confrontation between Lt. Smith and Mr. Arey. Anthony Pauza testified that he was at his bed approximately ten feet from the bathroom area at approximately 10:00 a.m. when he heard a discussion between Lt. Smith and Mr. Arey. When he first observed them, Mr. Arey was inside the bathroom area and Lt. Smith was right in front of the bathroom area. He had not heard Lt. Smith announced before she came on the floor. He stated that he was not surprised to see Lt. Smith making security rounds and added that she had gone into both the bathroom and shower areas as she was walking down the hallway. He claimed that only a few words were exchanged between Lt. Smith and Mr. Arey, that approximately 8 to 10 inmates were in the dormitory, and that he did not hear any vulgarity or disrespect.

Mark Griffin, Jr., testified that Lt. Smith was not announced when she entered the dormitory at approximately 10:00 a.m. He first saw her in the doorway of the dormitory as she came in but did not pay attention to where she was walking. He saw her again in front of the bathroom area when he heard Mr. Arey say something about a court case and announcing yourself and "some DCR type of thing." He denied any vulgarity or disrespect by Mr. Arey and stated that approximately eight to fifteen inmates were in the dorm at the time. Mr. Griffin admitted that he did not hear all the conversation between Mr. Arey and Lt. Smith and stated that he moved a little closer when the conversation was underway. Mr. Griffin's testimony was somewhat inconsistent with prior deposition testimony and written statements, and he admitted to some confusion about whether he saw Mr. Arey in the bathroom. Both inmates were participating in sick call,

and both testified that they saw an inmate, unaccompanied by a correctional officer, inventory Mr. Arey's property later that day.

Mark Withrow testified that he was on his bunk reading a book in the center aisle when Lt. Smith entered the dormitory. He did not hear her announced but did hear the door open and close from the control area and knew that she was doing rounds. He saw Mr. Arey come out of the bathroom and heard some conversation between the two of them. He said it was procedure to announce the female officers. According to Mr. Withrow there were approximately ten inmates in the dorm at the time. He was not on the sick list that day. He observed no disrespect or vulgarity, but agreed that he did not hear or see everything that happened. Edward Utz saw Lt. Smith after she entered but did not hear her announced. He saw Lt. Smith talking to Mr. Arey but did not hear the conversation. He was not sure how many inmates were in the dorm. Later that day he saw an inmate emptying Mr. Arey's locker.

As a result of the confrontation between Mr. Arey and Lt. Smith, Mr. Arey was given a notice of infraction issued by Lt. Smith charging him with violations of various rules, including Rule 27, which prohibits the demonstration of insolence or disrespect to any person, and Rule 30, which prohibits failure to possess or display an authorized DOC identification badge.[6,7] (Plaintiff's Exh. 19). Because of the notice of infraction, Mr. Arey had to be transferred to the Brockbridge Pre–Release Facility, located a short distance from the JPRU. Accordingly, his property was inventoried for the transfer. Following that inventory, another officer issued a notice of infraction to Mr. Arey for the possession of various alleged items of contraband.

Lt. Sandra Smith was the shift supervisor for the 6:00 a.m. to 2:00 p.m. shift at the old and then at the new JPRU. Lt. Smith had

---

5. Mr. Arey also testified that he never had any problems with Lt. Smith before that day, that she usually tried to resolve things and seemed reasonable.

6. Lt. Smith also charged violations of Rule 3, inciting any riot or disturbance, and Rule 25,

interfering with the performance of lawful duties. (Id.).

7. Division of Correction Regulation ("DCR") 110–30 requires possession of an identification badge. (Plaintiff's Exh. 18).

been called about a possible "sick out" occurring on September 24, 1990. When she arrived at work, approximately 35 inmates already had signed up for sick call as compared to a usual figure of approximately 10 to 15. (Defendants' Exh. 5). A JPRU "count work sheet" signed by Lt. Smith on September 24, 1990, indicated that 38 inmates were in the dorm at approximately 8:10 a.m. (Defendants' Exh. 14). A work-release sheet indicated that approximately 22 inmates had signed out of the dorm the morning of September 24, 1990. (Defendants' Exh. 15).

Assistant Warden Filbert had suggested that Lt. Smith make rounds and get a general feeling of the mood in the dormitories. She recalled entering dormitory E in housing unit 3 at approximately 9:45 a.m. She pressed the buzzer and saw Lt. Bell look out of the control bubble and unlock the door for her. When she went in she looked toward the bathroom and shower area but saw no one and proceeded to make her rounds.

Lt. Smith testified that she did security rounds every day and would announce herself if she were going into the shower and bathroom area. She did not announce herself on this occasion as she walked down one aisle, along the walkway in front of the bathroom shower area, and turned to go back up the furthest aisle.[8] She did not recall seeing Mr. Arey until she was returning toward the control bubble, when he began shouting that she was not allowed in the dorm without being announced and asked her if she had read Cpt. Lilley's memo regarding shower times. She told him she had and also told him to put his complaint in writing. He continued to follow her and question her regarding whether she was familiar with the "Levi Hudson case." According to Lt. Smith, Mr. Arey was "extremely loud," and

sounded "extremely angry." She considered him distraught and somewhat out of control. Other inmates stopped and turned to watch her discussion with Mr. Arey. She was the only officer in the dorm at that time. Lt. Smith did not recall seeing Mr. Arey until she turned around because of his shouting. (*See* location marked "A" on Plaintiff's Exh. 4). She did recall seeing his hand at his belt area.

Lt. Smith testified that the decision to issue Mr. Arey a notice of infraction was entirely hers. She issued the notice of infraction for what she considered his "blatant disrespect," including his tone of voice, loudness, and approaching her at a half-run. She stated that he had put her in a bad position, and that if one inmate "disrespected" her then the rest would also. She testified that as far as she knew the privacy issue had been resolved by the shower schedule established before the transition to the new JPRU. On cross examination she testified that she had never seen Mr. Arey in that state before, and that if he had spoken in a normal tone of voice and manner, she would have discussed the issue with him. Lt. Smith said she told Mr. Arey to meet her in the support building. When she spoke with him later, Mr. Arey said he had left his identification badge on his bunk.[9] Lt. Smith stated that if Mr. Arey had made sure to have his shirt on, he should have made sure to have his identification badge.

Cpt. Lilley testified that she approved Mr. Arey's transfer to Brockbridge because of the notice of infraction issued by Lt. Smith. Cpt. Lilley signed the notice of infraction issued to Mr. Arey based on what Lt. Smith had told her. She did not review his base file prior to making that decision.[10] Cpt. Lilley indicated that the fact the incident with Mr. Arey occurred during a sick-in af-

8. Officer Marcus W. Bell testified on September 24, 1990, he announced that a female officer was entering the dorm when he buzzed open the door for Lt. Smith to enter. He testified that he always announced females when they entered the new JPRU. His opinion that he announced Lt. Smith on September 24, 1990, appeared to rest solely on his belief that he always announced female officers entering JPRU. Lt. Smith did not recall hearing herself announced.

9. Lt. Smith agreed that if the badge had been on Mr. Arey's bunk, it should have been included in the property inventory done when Mr. Arey's belongings were packed. It was not. (Plaintiff's Exh. 45).

10. The plaintiff introduced a memorandum from Cpt. Lilley commending Mr. Arey for turning in a hacksaw blade on August 14, 1989. (Plaintiff's Exh. 40).

fected her decision, but even without the sick-in, a notice of infraction was warranted if Mr. Arey was disrespectful to Lt. Smith. She stated that privacy was not mentioned as part of the incident.

A disciplinary hearing was held on September 26, 1990, at which Mr. Arey appeared and presented affidavits from witnesses.[11] Based on that evidence and the report of Lt. Smith, who was not called to testify, a hearing officer found Mr. Arey guilty of Rule 30 for not possessing his identification badge and Rule 27 for insolence. The hearing officer recommended fifteen days' cell restriction for each violation to run concurrently from September 27, 1990. (Plaintiff's Exh. 28). As to the contraband, the hearing officer found Mr. Arey guilty of a violation of Rule 14, which prohibits use, possession, distribution, or accumulation of unauthorized medication, and hoarding or accumulation of authorized medication. (Plaintiff's Exh. 29).[12] This finding was based on Mr. Arey's admitted possession of a partially used tube of hydrocortisone cream, 0.5%, issued by the institutional pharmacy with a dispensing ("DSP") date of August 9, 1990, and a stopping date ("STP") of September 8, 1990, which was claimed to be "expired medication," and also on his possession of a second tube of hydrocortisone cream, 0.5%, purchased at a drug store while Mr. Arey was on family leave. The actual expiration date of the partially used tube of hydrocortisone was February 1991. (Plaintiff's Exh. 23). After the incident, Mr. Arey obtained another prescription starting September 29, 1990, also subject to refill. (Plaintiff's Exh. 24).

Mr. Arey explained that he had a prescription for hydrocortisone cream that had been refilled in August 1990. He could not get more without putting in a sick call slip and did not want to lose a day's pay. When he brought in the second tube from family leave in mid-September, he was strip-searched and the tube was seen by Sergeant Martin.

There was no contradiction of Mr. Arey's testimony that Sgt. Martin returned the hydrocortisone cream to him after the search.

On June 15, 1980, Division of Correction Regulation ("DCR") 220–6 was issued providing that any item that may be purchased in the commissary could not be received through the mail or through visitation. (Plaintiff's Exh. 41). Hydrocortisone cream 0.5% was not available for purchase in the commissary at the time of this incident. On August 29, 1988, DCR 220–6 provided that allowable inmate property included "Skin Cream or Lotion" in the amount of "4 (any combination)." (Defendant's Exh. 10); (see also Defendant's Exh. 7) (DCR 220–8, August 29, 1988, personal property inventory, "Skin cream/Lotion any comb." "Allow Quant. 4").

Permission had been given for inmates to receive health and hygiene products from visitors pending transfer to the new JPRU, although this permission expired upon transfer to the new JPRU. (Plaintiff's Exh. 21). In addition, various over the counter medications including hydrocortisone 0.5% cream were approved for sale in DOC commissaries on August 27, 1990. This approval was recognized for MCPRS inmates by a memo from Warden Corcoran to Mr. Filbert dated September 24, 1990. (Plaintiff's Exh. 22).[13] On September 27, 1990, three days after the infraction, MCPRS Directive no. 220–6–1 was issued containing an "allowable inmate property list" which listed numerous hygiene items, including "skin cream or lotion" in the amount of "4 (any combination)." (Plaintiff's Exh. 39). Nevertheless, Warden Corcoran signed the adjustment report approving the finding and recommendation of the hearing officer as to the Rule 14 violation on October 10, 1990, and refused a request for reconsideration on March 25, 1991. (Plaintiff's Exhs. 29, 38).

Mr. Arey was considered for reclassification on October 11, 1990. Based on the score

---

11. A tape of these proceedings was introduced as Plaintiff's Exh. 26.

12. Mr. Arey also was charged with possession of other items of contraband. A decision of not guilty was entered on the charges for the possession of the other items. (Id.).

13. Mr. Arey testified that he was aware the pharmaceutical committee had approved hydrocortisone cream for sale in the commissary approximately one month before the infraction.

he received under a "Security and Custody Reclassification Instrument," the recommended result was "no change." (Plaintiff's Exh. 30). The three-member classification team agreed with that result and recommended that Mr. Arey be maintained on pre-release status but transferred to the Eastern Pre–Release Unit ("E.P.R.U.").[14]

Assistant Warden Filbert, however, did not agree, recommending an "override" to medium security, a two-level increase. On October 18, 1990, Warden Corcoran directed further proceedings. (*Id.*). On October 19, 1990, the team recommended an over-ride to medium security.[15] Mr. Filbert and Mr. Corcoran agreed. (Plaintiff's Exh. 31). Mr. Arey was transferred to the Maryland Correctional Institution in Jessup ("MCI–J"). His appeal was denied by Warden Corcoran on December 6, 1990, (Plaintiff's Exh. 34), and again on April 9, 1991. (Defendant's Exh. 9).

Warden Corcoran testified to being "somewhat involved" in the design of the new JPRU. He asserted that his central concerns regarding the bathroom design related to the amount of space and the number of urinals, toilets and shower heads to be provided. He stated that there was not a great deal of concern regarding privacy because that was a more "detailed thing" that architects and engineers were supposed to take care of. When asked who else in the Division of Correction would have been considering the privacy issue, he identified several individuals in Secretary Robinson's office but indicated that he did not know first hand who was involved. He believed that Secretary Robinson could have ordered changes in the bathroom design. Warden Corcoran was aware of the privacy issue concerning the new JPRU at least by the time he received the letter of September 17, 1990, from Assistant Commissioner Mazzone.[16] He testified that the property list issued September 27, 1990, was the first time he was aware of a written directive being issued regarding property in the Maryland Correctional Pre–Release System. (*See* Plaintiff's Exh. 39).

No further written directive regarding privacy was issued until October 1990, after the incident with Mr. Arey. At that point, an order was issued stating:

1) Female Officers shall not conduct security rounds during scheduled shower hours on all shifts, except in the event of an emergency.

2) Each time a female Officer enters the dormitory to conduct a security round the Officer shall check the dormitory from the front by walking right to left visually checking each isle as she passes. Once the visual inspection is completed the Officer shall inform the Control Officer to announce that a female Officer will be conducting a security round.

(Plaintiff's Exh. 1). According to Assistant Warden Filbert, that policy took effect immediately after an Assistant Attorney General visited their facility to provide advice.[17]

Prior to September 24, 1990, Mr. Arey's only recent infraction had been on January 4, 1990 when he was found guilty of a violation of Rule 17 for unauthorized possession of money order or check. It appeared from his

14. The team stated that: Team agrees with the instrument's recommendation. The inmate was found guilty of not having an I.D., a questionable tone of voice and possession of hydrocortisone cream (athletes foot medication). The minor nature of these infractions do not warrant subject's reclass to greater security. His accomplishments and achievements while in the D.O.C. is a true indication that PRS custody is appropriate for Mr. Arey at this time. (Plaintiff's Exh. 30).

15. This time the team stated: Subject has received three (3) infractions within a 10 month period. The accumulative affects [sic] of these infractions are an indication that Arey is no longer maintaining a satisfactory institutional

adjustment. Arey is not exhibiting the appropriate self-control needed to remain in the Pre-release system. Due to subject's lack of control he presents a definite risk to the security and control of the institution, and a threat to public safety as well. (Plaintiff's Exh. 31).

16. Warden Corcoran indicated in response to another inmate's administrative remedy request in October 1990 that *Hudson v. Goodlander* did not apply to the pre-release system. (Plaintiff's Exh. 9). On direct examination he stated that he was not an attorney and that his understanding was in error.

17. *See* Defendant's Exh. 1.

testimony and DOC documents that this related to a misunderstanding concerning a reimbursement check. The classification team considering that offense in February 1990 recommended that he remain on prerelease status at JPRU.[18] Assistant Warden Filbert did not agree with that recommendation, preferring an override to medium security. On February 8, 1990, however, Warden Corcoran approved the team's recommendation.

■ While convicted defendants lose many freedoms upon entering prison, they do retain some constitutional right of privacy protecting them against unnecessary exposure of their genital areas to persons of the opposite sex. *Lee v. Downs*, 641 F.2d 1117, 1119–20 (4th Cir.1981); *Hudson v. Goodlander*, 494 F.Supp. 890, 892–93 (D.Md.1980); *see also Fisher v. Washington Metro. Area Transit Auth.*, 690 F.2d 1133, 1142 (4th Cir. 1982) (applying the *Lee* standard to pretrial detainees).

■ Mr. Arey first argues that Lt. Smith's alleged observation of him at the urinal violated his right to privacy. The route travelled by Lt. Smith on her September 24, 1990, rounds placed her in a position to observe Mr. Arey's genitals, whether or not she recalls seeing him. It is evident, however, that any observation by Lt. Smith was unintentional and unexpected by both parties. An inadvertent encounter of this type does not rise to the level of a constitutional violation. *Hudson*, 494 F.Supp. at 891; *Rodriguez v. Kincheloe*, 763 F.Supp. 463, 471 (E.D.Wash.1991) (finding no constitutional violation because "there is no evidence that this incident was anything but an isolated incident"); *Johnson v. Pennsylvania Bureau of Corrections*, 661 F.Supp. 425, 435 (W.D.Pa. 1987) (no violation of right to privacy where plaintiffs "did not produce sufficient evidence to show female guards saw plaintiffs unclothed other than inadvertently on a small number of occasions").

■ Mr. Arey further claims that Lt. Smith issued him a notice of infraction for disrespect and for failure to possess an identification badge in retaliation for his protected exercise of free speech in addressing the privacy issue. Such retaliation may violate the constitution. *See Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir.1988). I conclude from the testimony, however, that Lt. Smith issued the notice of infraction in response to the manner and not the content of Mr. Arey's comments. Perhaps understandably, Mr. Arey reacted emotionally to the unintended invasion of his privacy. Lt. Smith's decision to issue the ticket was a result of Mr. Arey's repeated loudness, his pursuit of her at a fast pace or half-run, and the creation of a sufficient confrontation to draw the attention of other inmates at a time when a protest in the form of a "sick-in" was underway. Mr. Arey has not shown an intentional violation of his First Amendment rights.

■ Mr. Arey also claims that the lack of privacy generally present in housing unit 3 in September 1990 violated his constitutional rights. Whether a particular prison regulation or practice violates an inmate's constitutional rights may be analyzed under the standard of review set forth by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The Court there held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. at 2261. Under *Turner*, four factors are relevant in deciding whether or not a regulation is reasonable. Applying *Turner* to a case involving the privacy rights of Nebraska State Penitentiary inmates, the Eighth Circuit enunciated those factors as follows:

> First, there must be a sufficient connection between the regulation and the governmental interest used to justify the regulation. Second, the availability of alternative means of exercising the right at issue must be considered. Third, consideration is re-

---

18. The team stated:
> Inmate has been PRSC–1 status since April 1988 and his progress has been satisfactory. Team feels that this ticket involved a misunderstanding over the reimbursement check.

In the other comments section, the team stated:
> This adjustment does not affect the security of the general population. Inmate remains a good risk to remain in PRSC–1 status.

(Plaintiff's Exh. 32).

quired of the impact that accommodating the asserted right would have on guards, other inmates, and prison resources. Fourth, the availability of ready alternatives to the regulation should be considered. The Court stressed that this last factor is not a " 'least restrictive alternative' test," but rather a *de minimis* test: if there is an alternative available at only a *de minimis* cost to prison objectives, that is evidence of an unreasonable regulation. *Timm v. Gunter,* 917 F.2d 1093, 1099 (8th Cir.1990) (citations omitted), *cert denied.,* —— U.S. ——, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991); *see also Michenfelder v. Sumner,* 860 F.2d 328, 333 (9th Cir.1988).

The combined effect of the open dormitory and the open bathroom area at the new JPRU is to put inmates on display virtually 24 hours a day no matter how personal an activity they may be involved in. A shower schedule that allows female guards unrestricted access to the dormitory from 8:30 a.m. to 4:30 p.m. means there is no opportunity for an inmate to change clothes during that time period or use the toilet without the likelihood of being seen by a correctional officer of the opposite sex. Basic human dignity requires some minimal protection of privacy, at least from the opposite sex and particularly where no security concerns have been advanced to justify the design chosen. *See Smith v. Chrans,* 629 F.Supp. 606, 610–11 (C.D.Ill.1986).

Applying the first *Turner* factor to this case, the state has not articulated any interest it may have in exposing the bathroom area to the view of the rest of the dormitory. Presumably, the state has a general interest in maintaining security that might justify construction of an open bathroom area under some circumstances. In the old JPRU, however, the bathroom area was completely enclosed by full solid walls. A door blocked the entrance, and inside shower curtains gave the shower area additional privacy. No evidence has been presented that such a construction resulted in security problems in the old JPRU, nor was there evidence as to why the open air design was implemented in the new JPRU. By contrast, in the *Timm* case, there was ample evidence of frequent and serious assaults necessitating greater opportunities for surveillance. *Id.* at 1101. Similarly, in *Grummett v. Rushen,* 779 F.2d 491, 496 (9th Cir.1985), the inmates did not challenge the internal security needs that justified "occasional" surveillance by female guards.

As for the second factor, there is no alternative way for the prisoners to exercise this right of privacy than to be adequately shielded from view while performing ordinary bathroom functions.

The third factor is related to the first and involves a similar analysis. Because the defendants have failed to demonstrate any security or other problem that resulted from the enclosed bathroom area at the old JPRU, it is unlikely that increasing the privacy of the new JPRU bathroom facilities will impact the guards' duties. For example, it is not clear from the testimony whether there was a uniform policy in effect in September 1990 under which female officers announced themselves before entering the dormitory or approaching the bathroom. Implementation of such a policy would have minimal impact on the guards' performance of their jobs. Further, a schedule of times in which female guards would not be present in the dormitory (in addition to those times in the original shower schedule) would increase the privacy of the prisoners without significant intrusion on the guards' duties.

The impact on prison resources would be minimal. Shower curtains could be hung from the ceiling and draped to the top of the walls. Another alternative is sliding plastic windows which would be semi-opaque. Although Unit Manager Passaro and Assistant Warden Filbert did not install shower curtains because they feared the curtains would not stay up or would tear and need to be replaced, such untested apprehension is not sufficient to rule out this option.

The fourth factor also is satisfied. An increase in privacy, through various methods, was readily available. As noted above, it could have been implemented with a *de minimis* cost to prison security and relatively little cost in terms of dollars.

Accordingly, I would find that, under a *Turner v. Safley* analysis, Mr. Arey's constitutional right to privacy was violated by the design and operation of the bathroom facilities in the dormitory at the new JPRU in September 1990.

Mr. Arey also claims that the design of the new JPRU violates the decree issued by this Court in *Hall v. Maryland Comm'n on Human Relations*, civil no. Y–80–3161. Paragraph six states,

> In those Division of Correction institutions having mass showering facilities, the State will provide for the installation of shower curtains to be so designed as to shield from the view of a female correctional officer a male inmate's mid torso.... Female correctional officers shall not be permitted to enter the actual toilet or shower facility itself while male inmates are in the actual act of showering or using the toilet facilities unless such entry is announced in advance and inmates are given a reasonable time to cover themselves.... In those institutions where toilet and shower facilities are located within a dormitory, the State shall modify the shower or toilet facilities in accordance with this paragraph and, additionally, the State shall construct partitions or make similar physical modifications to the toilet or shower facilities so as to ensure that male inmates' mid-torsos are shielded from view by female correctional officers while male inmates are utilizing the facilities.

Paragraph seven provides in part:

> The State shall seek to ensure that inmates assigned to such dormitories have their right to privacy preserved by setting aside a fifteen minute period every two hours during which any female correctional officers working inside such dormitories will be removed and replaced by male correctional officers to allow inmates housed therein to perform any necessary activities which might involve nudity including the changing of clothing, etc.

(*See* Court's May 9, 1990 Report and Recommendation, attached Decree). The decree states that it applies "to all correctional facilities operated by the Division of Correction of the Maryland Department of Public Safety and Correctional Services" and "all new correctional facilities to be built and operated by the Department of Public Safety and Correctional Services in the future." (*Id.* ¶ 2).

■ The state's entry into the *Hall* consent decree is evidence of the availability of options to protect inmates' privacy. The plaintiff, however, has failed to demonstrate that he personally has standing to sue under the *Hall* decree. Violation of a consent decree, in which a defendant may agree to standards more stringent than those imposed by the constitution, does not necessarily amount to a violation of the federal constitution as required for an action under § 1983. *See Baker v. McCollan*, 443 U.S. 137, 146–47, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979). Therefore, although I recommend a finding that the design of the new JPRU violated Mr. Arey's constitutional right to privacy, I would find that Mr. Arey fails to establish a claim for violation of the *Hall* decree.

■ The defendants assert that they are entitled to the defense of qualified immunity. The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Korb v. Lehman*, 919 F.2d 243, 246 (4th Cir.1990), *cert. denied*, ── U.S. ──, 112 S.Ct. 51, 116 L.Ed.2d 28 (1991). The focus is on the "objective legal reasonableness" of the action in light of the laws that were "clearly established at the time." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). An official may be entitled to immunity from suit even if he has violated a plaintiff's rights if the rights were not then "clearly established" or "if 'a reasonable person' in the official's position would have failed to appreciate that his conduct would violate them." *Korb*, 919 F.2d at 247 (quoting *Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir.1990)). "If there exists a 'legitimate question' as to whether particular conduct violates a particular right then the right is

not clearly established and qualified immunity applies." *Id.*

I would find that the defendants are entitled to the defense of qualified immunity in this case. The plaintiff claims that his right to privacy is clearly established by the *Hudson* case. (Plaintiff's Post–Evid. Mem.). *Hudson* established that a male prisoner has a right to privacy which is violated by the assignment of female guards to posts where they can view him while he is unclothed. *See Hudson*, 494 F.Supp. at 893. Whether a particular construction of facilities violates this right, however, is a more difficult question. In this case, the evidence indicates that the walls in front of the bathroom area were of sufficient height that an inmate's private areas could not be viewed from the control booth.[19] In addition, there was some evidence of a policy requiring female guards to announce themselves before approaching the bathroom area. Many different designs may be implemented in constructing a dormitory and the accompanying bathroom and shower areas. Under these circumstances, reasonable persons in the officials' positions in September 1990 could have failed to appreciate that the construction of the new JPRU and the guard assignments would violate the plaintiff's rights.[20]

■ Mr. Arey's request for injunctive relief also must be denied. The transfer of a prisoner moots his request for injunctive relief against conditions of confinement in the facility from which he was transferred. *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir. 1987); *Taylor v. Rogers*, 781 F.2d 1047, 1051 (4th Cir.1986) (claims for injunctive relief regarding conditions of protective custody were moot as to prisoners who returned to general population or were paroled). Mr. Arey was transferred from the new JPRU to Brockbridge Correctional Facility and then to the Maryland Correctional Institute–Jessup, where he is currently housed. Accord-

ingly, Mr. Arey may not obtain injunctive relief as to the conditions at the new JPRU.

■ Mr. Arey also claims that he was denied due process in connection with the issuance of the notices of infraction and finding of guilt for failure to possess an identification card, insolence, and possession of contraband. In *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court held that certain procedural protections are required before inmates lose good time credits or are subjected to solitary confinement. These include: (1) advanced written notice of the claimed violation, at least 24 hours before the administrative hearing; (2) a written statement of the factfinder as to evidence relied upon and the reasons for the disciplinary action taken; and (3) opportunity to call witnesses and present documentary evidence when permitting this will not be unduly hazardous to institutional safety or correctional goals. *Id.* at 563–67, 94 S.Ct. at 2978–80. The Court stated, "We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges." *Id.* at 571–72 n. 19, 94 S.Ct. at 2982 n. 19.

In *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), the Supreme Court held that a prison disciplinary board's revocation of good time credits must be supported by "some evidence" in the record in order to satisfy the minimum requirements of due process.[21] *Id.* at 454, 105 S.Ct. at 2773. The Court explained the process of reviewing a prison disciplinary board's decision:

Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence

---

**19.** Nevertheless, it is evident to anyone observing inmates in the bathroom from the control booth that personal functions are being performed.

**20.** I note also the candid assessment of the Legal Aid attorney that she could not predict "how a court would rule" on the new design, and the fact that the personnel managing the new JPRU

did call upon the Attorney General's office for advice.

**21.** The Court also described this standard as a "modicum of evidence." *Id.* at 455, 105 S.Ct. at 2774.

in the record that could support the conclusion reached by the disciplinary board. *Id.* at 455–56, 105 S.Ct. at 2774.

*Wolff* and *Hill* do not appear applicable to the tickets for insolence and failure to possess an identification card, because no loss of good time or sentence of solitary confinement was imposed.[22]

■ The infraction for possession of hydrocortisone cream 0.5% also was considered at the September 26, 1990, hearing and a guilty finding was issued. The penalty was loss of ten days good time credits and a segregation sentence of ten days. (Plaintiff's Exh. 29). Therefore the due process requirements in *Wolff* and *Hill* apply to this infraction. Although Mr. Arey received his procedural protections of notice, written reasons, and a hearing, I would find that the regulations in effect at the time of the offense regarding the possession of hydrocortisone cream 0.5% were vague and Mr. Arey's punishment pursuant to them was unconstitutional.

A prison's definition of contraband must be "sufficient to apprise any inmate of ordinary intelligence that possession of the [subject] property is forbidden." *Gaston v. Taylor,* 946 F.2d 340, 342 (4th Cir.1991) (citing *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). Mr. Arey was found guilty of possession or accumulation of unauthorized medication. The half used tube of hydrocortisone cream was issued to Mr. Arey by the institutional pharmacy. (*See* Plaintiff's Exh. 23). Although the stop date had passed, the medicine did not expire until February 1991. The policy apparently in effect at the time of the infraction required inmates to return "discontinued and/or outdated medications to the pharmacy within 24 hours of a physician order and/or expiration date." (*See* Plain-

tiff's Exh. 42).[23] There is no specific reference to a stop date. The only term that provides guidance is "expiration date." This term could reasonably be interpreted as referring to the expiration date and not the stop date. Therefore, I would find that the inmate property regulations were vague and failed to apprise an inmate of ordinary intelligence that failure to return medication after the "stop" date constituted possession of unauthorized medication, particularly when refills of the prescription were permitted.

Mr. Arey had obtained the other tube of hydrocortisone cream on a family leave and brought it back to the new JPRU. He stated that he did this because obtaining a refill from the institution would have required putting in a sick call slip and losing a day's pay. His uncontroverted testimony was that Sgt. Martin observed the cream during a search of Mr. Arey on his return from the family leave and allowed him to take it into the institution.

I would find that Mr. Arey should not have been punished for possession of the full tube of hydrocortisone cream. Over-the-counter hydrocortisone cream ordinarily would fall under the definition of skin cream or lotion, "any combination." The defendants have not provided any evidence to the contrary. Because hydrocortisone cream was not available in the commissary, the rule against bringing in items that were available does not apply.

In addition, inmates at the old JPRU were allowed to bring in "health and hygiene" products before transfer. There is no indication, however, of what procedures were in place to determine what was allowed to be brought in. Although it is clear that once the new JPRU opened, the inmates were not to continue to bring in these items, it is not apparent if regulations existed for governing what the prisoners could take with them during the transfer to the new JPRU. Mr.

---

22. If they are applicable, I would find that due process protections were provided and "some evidence" supported the hearing officer's decisions.

23. On October 15, 1990, this was changed:
    Assessment of practice within the institution has determined that the requirement for return of discontinued and/or outdated medications to the pharmacy within 24 hours of a physician order and/or expiration date is unrealistic. Therefore, existing section VI.D.1. is rescinded. New Section VI.D.1.5. shall read as follows:
    Discontinued and/or outdated medications shall be returned to the pharmacy at least weekly after the physician order and/or expiration date.
    (Plaintiff's Exh. 42).

Arey had been issued a prescription for hydrocortisone cream. As discussed above, he properly possessed the remaining portion. He provided a reason for bringing the second tube back from family leave. Sgt. Martin allowed him to bring the medication into the institution. Shortly after the infraction, hydrocortisone could be obtained from the commissary. On September 29, 1990, Mr. Arey was allowed to renew his prescription for hydrocortisone cream.

All of these factors weigh in favor of finding that the rules and regulations in effect at the time of this incident were unconstitutionally vague as to possession of hydrocortisone cream. Due process requires that Mr. Arey's determination of guilt be vacated. *See Gaston,* 946 F.2d at 342; *Smith v. Rowe,* 761 F.2d 360, 364 (7th Cir.1985) (regulation regarding possession of certain electronic equipment "was so vague that no prison inmate of reasonable intelligence could be expected to understand that a camera, film, and microphones, were included as contraband under its provisions").[24] Therefore Mr. Arey's good time credits should be restored and he should be reconsidered for classification.

Although Mr. Arey also seeks monetary damages for this violation, I would find the defendants entitled to qualified immunity. In light of the vagueness and ambiguity of the regulations, the issuance of the infraction and affirmance of the finding could not have violated clearly established constitutional rights.

As for the transfer to medium security, I would find there is insufficient evidence to establish that this was done by any of the defendants in retaliation for Mr. Arey's exercise of his rights.[25] The guilty findings as to the insolence and the identification card infractions meet constitutional requirements. Although Mr. Arey claims damages for the termination of his work release position, the transfer to Brockbridge and the fifteen day cell restriction properly issued for the insolence and identification card violations would

have barred him from participating in the program. Therefore no damages should be awarded for that claim.

The defendants have requested that they be dismissed from this suit for lack of personal involvement with the claims at issue. (Defendant's 8/5/91 Motion). Because I recommend that the defendants are entitled to qualified immunity on Mr. Arey's claims, it is not necessary to engage in a detailed analysis of which defendants are proper parties. I have recommended that Mr. Arey's good time credits be reinstated and that he be reconsidered for classification. This should be carried out by the appropriate officials.

Mr. Arey also has requested as damages an amount of attorney's fees in this case, and his attorney has submitted billing sheets. (Plaintiff's Exh. 35). A finding of qualified immunity, however, precludes any such award. As for the time spent on this case, Mr. Arey may file a petition for attorney's fees, if appropriate, after the district judge acts on this report and recommendation.

In summary, it is hereby recommended that:

1. judgment be entered in favor of Mr. Arey on his claim for infringement of his constitutional right to privacy by the design and operation of the new JPRU in September 1990;

2. judgment be entered in favor of Mr. Arey on his claim that his disciplinary conviction for possession of certain medication in violation of Rule 14 violated his constitutional right to due process;

3. defendants be found entitled to qualified immunity precluding a monetary damage award in those claims;

4. injunctive relief be provided in the form of an order directing the state to expunge the Rule 14 conviction from Mr. Arey's record and to have his classification reconsidered by officials not involved in the 1990 incidents or classification and transfer decisions; and,

---

**24.** In the alternative, I would find insufficient evidence of "unauthorized" possession of medication, in violation of *Superintendent v. Hill.*

**25.** Nevertheless this transfer should be reconsidered by different correctional officials with the conviction for Rule 14 stricken from Mr. Arey's record.

5. judgment be entered in favor of the defendants on all other claims.

April 3, 1992